**NINIGRET DEVELOPMENT CORP.,**
**Plaintiff, Appellant,**

v.

**NARRAGANSETT INDIAN WETUO-**
**MUCK HOUSING AUTHORITY,**
**Defendant, Appellee.**

**No. 99–1828.**

United States Court of Appeals,
First Circuit.

Heard Feb. 8, 2000.

Decided March 22, 2000.

---

Joseph F. Dugan for appellant.

John F. Killoy, Jr., with whom Law Offices of H. Jefferson Melish was on brief, for appellee.

Before TORRUELLA, Chief Judge, SELYA and LIPEZ, Circuit Judges.

SELYA, Circuit Judge.

This matter requires us to explore the complex web of considerations that envelops the interrelationship between federal courts and Indian tribal courts. We conclude that the district court had subject-matter jurisdiction under 28 U.S.C. § 1331. Withal, the scope of that jurisdiction was narrow, enabling the court, in effect, only to pass upon (1) the extent of the tribal court's jurisdiction over the plaintiff's claims, and (2) the defendant's assertion that, as an arm of a federally recognized Indian tribe, the impervious shield of tribal sovereign immunity protected it from suit. We hold that the defendant waived its immunity, that the tribal exhaustion doctrine applies, and that the remaining issues in the case (including the validity *vel non* of the contractual forum-selection clause that the district court found to be determinative) must first be aired before the tribal court. Accordingly, we vacate the existing judgment and remand with instructions.

## I. BACKGROUND

The Narragansett Indian tribe (the Tribe), a federally recognized tribe, established the Narragansett Indian Wetuomuck Housing Authority (the Authority) in October 1985 pursuant to a tribal ordinance. The Authority functions under

regulations promulgated by the United States Department of Housing and Urban Development (HUD). *See* 24 C.F.R. § 1000.10 (1998) (governing establishment and operation of Indian housing authorities). In the fullness of time, the Authority and plaintiff-appellant Ninigret Development Corporation (Ninigret)—a Rhode Island business corporation in which a member of the Tribe apparently is a principal—embarked upon a series of business transactions.

The litigation underlying this appeal stems from one such transaction: an agreement entered into between the parties for the construction of a low-income housing development known as the Narragansett Indian Wetuomuck Community Village (the Village project). After Ninigret began work, difficulties arose in connection with the installation of water and sewerage lines. The Authority blamed the problems on faulty workmanship and insisted that Ninigret take corrective action. Ninigret demurred, asserting that it had done the work in conformance with the Authority's specifications, and that the Authority should pay for any necessary remediation. After efforts at conciliation failed, the Authority cancelled the project.

Acting pursuant to a forum-selection clause contained in the contract between the parties (quoted *infra* Part III(B)), the Tribal Council notified the disputants that it would hold a hearing on September 23, 1997. The Authority appeared, but Ninigret did not. The Tribal Council subsequently issued a decision in which it found, inter alia, that Ninigret had failed to fulfill its contractual obligations and, therefore, was liable for the anticipated cost of all corrective work to the water and sewerage lines. The decision concluded with a reminder that, pursuant to the contract, either party had a right to demand binding arbitration within twenty-one days.

Ninigret ignored the particular arbitration mechanism specified in the contract. Instead, it demanded either arbitration "before an unbiased third party, not related to the tribe in any manner," or an agreement that the parties bypass arbitration entirely and "resolve their disputes in Federal District Court." The Authority displayed no interest in either of these alternatives.

On March 3, 1998, Ninigret sued the Authority in Rhode Island's federal district court. In its complaint, Ninigret asserted six statements of claim against the Authority anent the Village project (e.g., breach of contract, fraud, conversion). It also asserted two causes of action related to other matters, *viz.*, a claim sounding in fraud involving the so-called Home Improvement Project and a claim *ex contractu* regarding work on the Four Winds Community Center. Finally, it lodged a salmagundi of claims against a Connecticut corporation, Building Teams, Inc. (BTI), which had done some work in connection with the Village project.

The Authority moved to dismiss the complaint for want of jurisdiction under Fed.R.Civ.P. 12(b)(1). The appellant countered by filing a motion to stay proceedings pending arbitration. The district court held a consolidated hearing and reserved decision on both motions. The court then wrote a thoughtful opinion in which it held that it had jurisdiction to determine the validity and effect of the contract's forum-selection clause in respect to the claims relating to the Village project; ruled that clause enforceable; and dismissed the Village project claims because the appellant had failed to follow the clause's dictates. *See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 32 F.Supp.2d 497, 503–06 (D.R.I. 1999).[1] The court then declined to exer-

---

1. In so ruling, the court purposed to act under Rule 12(b)(6) rather than Rule 12(b)(1), and therefore dismissed the action with prejudice. *See Ninigret*, 32 F.Supp.2d at 501–02, 505; *see also Lambert v. Kysar*, 983 F.2d 1110, 1112 n. 1 (1st Cir.1993) (indicating that Rule 12(b)(6) is the appropriate vehicle for

cise supplemental jurisdiction over the claims implicating other projects, dismissing them without prejudice. *See id.* at 502–03. Ninigret subsequently resolved its differences with BTI, dismissed the action as to that defendant, and prosecuted this appeal.

## II. SUBJECT–MATTER JURISDICTION

The threshold question in this case relates to the existence *vel non* of subject-matter jurisdiction. We must examine two possible sources: diversity jurisdiction, *see* 28 U.S.C. § 1332, and federal question jurisdiction, *see* 28 U.S.C. § 1331. We conclude that the claim of diversity jurisdiction is ill-advised, but that federal question jurisdiction inheres (although we define its scope more narrowly than did the court below).

### A

■ The appellant initially premised its suit on diversity jurisdiction. The district court rejected that theory, *see Ninigret,* 32 F.Supp.2d at 502, and rightly so.

■ Diversity jurisdiction requires, inter alia, complete diversity of citizenship between all plaintiffs, on one hand, and all defendants, on the second hand. *See Caterpillar, Inc. v. Lewis,* 519 U.S. 61, 68, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996); *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 267, 2 L.Ed. 435 (1806). An Indian tribe, however, is not considered to be a citizen of any state. *See Akins v. Penobscot Nation,* 130 F.3d 482, 485 (1st Cir.1997); *Romanella v. Hayward,* 114 F.3d 15, 16 (2d Cir.1997) (per curiam); *Gaines v. Ski Apache,* 8 F.3d 726, 729 (10th Cir.1993).

Consequently, a tribe is analogous to a stateless person for jurisdictional purposes. *See* 13B Charles Alan Wright et al., *Federal Practice and Procedure* § 3622, at 585–86 (1984). It follows that, notwithstanding the joinder of other diverse parties, the presence of an Indian tribe destroys complete diversity. *See Romanella,* 114 F.3d at 15–16; *Calumet Gaming Group–Kansas, Inc. v. Kickapoo Tribe,* 987 F.Supp. 1321, 1325 (D.Kan. 1997); *cf. Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 829–30, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) (calling a stateless person a "jurisdictional spoiler"). We see no reason why the Authority (an arm of the Tribe, not separately incorporated) should be treated any differently for jurisdictional purposes.[2]

### B

■ At the hearing held on the Authority's motion to dismiss, the appellant posited the existence of a federal question as an alternative basis for subject-matter jurisdiction over the Village project claims. The lower court entertained the argument and, in the end, accepted it. *See Ninigret,* 32 F.Supp.2d at 503. We emulate this example.

■ The possibility of federal question jurisdiction is all the more enigmatic because the historic interrelationship between federal courts and tribal courts is freighted with uncertainty. Still, the rudiments are reasonably clear. "The question whether an Indian tribe retains the power to compel a non-Indian ... to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law...." *National Farmers*

---

dismissal on the basis of non-compliance with a contractual forum-selection clause).

**2.** From this point forward, we limit our discussion of the appellant's claims to those arising out of the Village project. The Authority interposed no assertion of tribal court jurisdiction over the appellant's other causes of action, and apart from its unsuccessful invocation of diversity, the appellant has neither

asserted an independent basis for federal jurisdiction in regard to those claims nor offered any developed argumentation challenging the district court's refusal, in its discretion, to exercise supplemental jurisdiction over them. *See Ninigret,* 32 F.Supp.2d at 503–04. Thus, the lower court's dismissal of those counts, without prejudice, must stand.

*Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 852, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). That question, therefore, is a federal question within the purview of 28 U.S.C. § 1331. *See id.* In other words, "federal courts have authority to determine, as a matter 'arising under' federal law," the limits of a tribal court's jurisdiction. *El Paso Natural Gas Co. v. Neztsosie,* 526 U.S. 473, 483, 119 S.Ct. 1430, 1437, 143 L.Ed.2d 635 (1999). The fact that a plaintiff's claims are not premised on federal law does not alter this result. *See, e.g., National Farmers,* 471 U.S. at 847, 853, 105 S.Ct. 2447 (applying principle in context of personal injury claim); *Crawford v. Genuine Parts Co.,* 947 F.2d 1405, 1406 (9th Cir.1991) (similar); *see also Duncan Energy Co. v. Three Affiliated Tribes,* 27 F.3d 1294, 1295–96 (8th Cir. 1994) (applying principle in context of suit based on tribal laws).

We need not paint the lily. The short of it is that because the Authority made a colorable case for tribal court jurisdiction over Ninigret's principal claims and Ninigret disputed that proposition, the district court had authority to determine the extent of the tribal court's jurisdiction. *See El Paso Natural Gas,* 526 U.S. at 483, 119 S.Ct. at 1437; *Basil Cook Enters. v. St. Regis Mohawk Tribe,* 117 F.3d 61, 65 (2d Cir.1997).

### III. TRIBAL SOVEREIGN IMMUNITY

■ Where, as here, a party to a case pending in a federal court asserts a colorable claim that a tribal court has primary jurisdiction, charting the existence and extent of that jurisdiction demands careful study of the tribal exhaustion doctrine. Before undertaking a determination of the reach of that doctrine, however, we must address the Authority's claim of tribal sovereign immunity.

### A

■ Two fundamental premises dictate our order of progression. First, although tribal sovereign immunity is jurisdictional in nature, consideration of that issue always must await resolution of the antecedent issue of federal subject-matter jurisdiction. *See In re Prairie Island Dakota Sioux,* 21 F.3d 302, 304–05 (8th Cir.1994). This sequencing follows inexorably from *Oklahoma Tax Commission v. Graham,* 489 U.S. 838, 841, 109 S.Ct. 1519, 103 L.Ed.2d 924 (1989), in which the Court held that the mere presence of a tribal sovereign immunity defense did not, in and of itself, "convert a suit otherwise arising under state law into one which, in the statutory sense, arises under federal law." Logically, this reasoning compels a conclusion that a federal court can address such a defense only after it confirms independently that subject-matter jurisdiction exists.

The second premise that affects our sequencing determination concerns the relationship between tribal sovereign immunity and the tribal exhaustion doctrine. The question here (which, as we have said, arises only after the inquiry into subject-matter jurisdiction has been answered affirmatively) relates to whether the federal court or the tribal court should pass upon the sovereign immunity defense, at least initially. On this question, the authorities are in some disarray.

■ The Eighth Circuit has held that a district court should begin this phase of its inquiry by addressing exhaustion and, if it determines that tribal remedies must be exhausted, give the tribal court the first crack at considering the bona fides of the sovereign immunity defense. *See Davis v. Mille Lacs Band of Chippewa Indians,* 193 F.3d 990, 992 (8th Cir.1999). That view appears to be based on a misreading of *National Farmers,*[3] and it has mustered

3. In *Davis,* 193 F.3d at 992, the panel referred to *National Farmers,* 471 U.S. at 855–56, 105 S.Ct. 2447, but apparently confused the Court's reference to "sovereignty" with "sovereign immunity." However, the cases cited by the *National Farmers* Court immedi-

scant support elsewhere. We respectfully decline to adopt it and hold instead that, as long as federal subject-matter jurisdiction exists, a defense predicated on tribal sovereign immunity is susceptible to direct adjudication in the federal courts, without reference to the tribal exhaustion doctrine.[4] *See TTEA v. Ysleta Del Sur Pueblo*, 181 F.3d 676, 680–81, 683–84 (5th Cir. 1999); *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 812–15 (7th Cir.1993). We believe that this conclusion flows naturally from the reality that the sovereignty of Indian tribes is subject to congressional control, with the result that tribal sovereign immunity is necessarily a matter of federal law.[5] *See Kiowa Tribe v. Manufacturing Technologies*, 523 U.S. 751, 759, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998); *Osage Tribal Council v. United States Dep't of Labor*, 187 F.3d 1174, 1180 (10th Cir.1999). We turn, then, to the merits of the Authority's immunity defense.

**B**

■■■■ Tribal sovereign immunity "predates the birth of the Republic." *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 694 (1st Cir.1994). The immunity rests on the status of Indian tribes as autonomous political entities, retaining their original natural rights with regard to self-governance. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832). The Authority, as an arm of the Tribe, enjoys the full extent of the Tribe's sovereign immunity. *See Dillon v. Yankton Sioux Tribe Hous. Auth.*, 144 F.3d 581, 583–84 (8th Cir.1998); *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668, 670–71 (8th Cir.1986). Therefore, we shall not distinguish between the Tribe and the Authority in discussing concepts such as tribal immunity and tribal exhaustion.

■■■■ Generally speaking, the doctrine of tribal sovereign immunity precludes a suit against an Indian tribe except in instances in which Congress has abrogated that immunity or the tribe has foregone it. *See Kiowa Tribe*, 523 U.S. at 754, 118 S.Ct. 1700. The parties (who agree on little else) concur that Congress has not abrogated the Tribe's immunity vis-à-vis this suit. The appellant argues forcefully, however, that the Tribe waived its sovereign immunity by virtue of the enactment of Tribal Ordinance HA–195 and the execution of the contract for the Village project. We dissect that argument.

When the parties entered into the contract for the Village project, HUD required the enactment of a tribal ordinance

ately following its mention of tribal sovereignty, *see New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 331–32, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982); *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), make it crystal clear that, in the passage in question, the Court was addressing the dependent status of Indian tribes and the intergovernmental relationship between states and tribes, as opposed to sovereign immunity. *See National Farmers*, 471 U.S. at 856 & n. 19, 105 S.Ct. 2447.

4. The Ninth Circuit has straddled the fence as to this point, holding that the issue of tribal sovereign immunity is for the tribal court in cases in which that issue turns on an interpretation of tribal law. *See Stock West Corp. v. Taylor*, 964 F.2d 912, 920 (9th Cir.1992) (en banc).

5. Although the tribal exhaustion doctrine also implicates federal law, the issues associated with it are distinguishable in important ways from those associated with tribal sovereign immunity. Principles of comity strongly suggest that the tribal court be allowed to determine, in the first instance, the scope of its own jurisdiction, whereas the issue of whether a suit may be brought against a tribe at all, in any forum, is of equal interest to the federal and tribal courts. *See, e.g., Kiowa Tribe v. Manufacturing Technologies*, 523 U.S. 751, 754–60, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998) (directly addressing questions of tribal sovereign immunity); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (same).

containing pat terminology as a condition precedent to an Indian housing authority receiving federal funds. *See* 42 C.F.R. § 950 (1995) (now supplanted). Tribal Ordinance HA–195, the relevant text of which is reproduced in the margin,[6] faithfully replicates this language (save only for a few inconsequential typographical errors). Due to HUD's formulaic approach, several other decisions have dealt with substantially identical ordinances.

An occasional case appears to have held that the enactment of such an ordinance, without more, constitutes an effective waiver of sovereign immunity. *See, e.g., Snowbird Const. Co. v. United States,* 666 F.Supp. 1437, 1440–41 (D.Idaho 1987). In our judgment, the better view holds that the enactment of such an ordinance, in and of itself, does not waive a tribe's sovereign immunity. *See Dillon,* 144 F.3d at 583–84; *Buchanan v. Sokaogon Chippewa Tribe,* 40 F.Supp.2d 1043, 1047 (E.D.Wis.1999). After all, the ordinance, by its terms, authorizes the Authority to shed its immunity from suit "by contract," and these words would be utter surplusage if the enactment of the ordinance itself served to perfect the waiver. Statutes and ordinances normally should be read to give effect to every word and phrase, *see, e.g., Lopez–Soto v. Hawayek,* 175 F.3d 170, 173 (1st Cir.1999); *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 751–52 (1st Cir.1985), and there is no compelling reason to make this case an exception. Accordingly, we conclude that the Tribe's adoption of Tribal Ordinance HA–195, in and of itself, did not forfeit the Authority's immunity.

This does not end our interpretive odyssey, for the appellant urges persuasively that the ordinance, *coupled with the contract,* effects the necessary waiver. In this respect, the appellant calls particular attention to Article 14 of the contract, the forum-selection clause, which provides in pertinent part that:

14.1 All claims, disputes and other matters in question between the Parties to this Agreement arising out of or relating to this Agreement or the breach thereof, shall be first presented to the Tribal Council for resolution and in the event of non-resolution, then to the Tribal Court which will appoint an Arbitration Board.... This Agreement to arbitrate and any agreement to arbitrate with an additional person or persons duly consented to by the Parties to this Agreement shall be specifically enforceable under prevailing arbitration law.

14.2 Notice of the demand for arbitration shall be filed in writing with the other Party or Parties to the Agreement and with the Tribal Council....

14.3 The award rendered by the Council or Arbitration Board appointed by the Tribal Court shall be final. Upon exhaustion of final remedy in Tribal Court leading to non-resolution and as a civil option, the Parties may, with written agreement from both, institute a Civil Action in Federal District Court.

Whether, and to what extent, an arbitration or forum-selection clause (we use the labels interchangeably in describing Article 14) constitutes a waiver of a tribe's sovereign immunity turns on the terms of that clause. The courts are not consentient on the degree of specificity that must be employed. *Compare, e.g., Val–U Const. Co. v. Rosebud Sioux Tribe,* 146 F.3d 573, 577–78 (8th Cir.1998) (finding waiver), *and Sokaogon Gaming Ent. Corp. v. Tushie–Montgomery Assoc.,* 86 F.3d 656, 659–60 (7th Cir.1996) (same) *with Pan American Co. v. Sycuan Band of Mission Indians,* 884 F.2d 416, 418–20

---

**6.** Tribal Ordinance HA–195 provides in pertinent part:

The Council hereby gives its irrevocable consent to allowing the Authority to sue or be sued in its corporate name, upon any contract, claim or obligation arising gout [sic] of its activities under the ordinance and hereby authorities [sic] the Authority to decree by contract to waive any immunity from suit which it might otherwise have; but the Tribe shall not be liable for the debts or obligations of the Authority.

(9th Cir.1989) (finding no waiver). Like the Seventh and Eighth Circuits, we are of the opinion that courts must take a practical, commonsense approach in attempting to separate words that fairly can be construed as comprising a waiver of tribal sovereign immunity from words that fall short. *See Sokaogon,* 86 F.3d at 660; *Rosebud Sioux Tribe v. Val–U Const. Co.,* 50 F.3d 560, 563 (8th Cir.1995). Pursuing that approach, we believe that explicit language broadly relegating dispute resolution to arbitration constitutes a waiver of tribal sovereign immunity, whereas language that is ambiguous rather than definite, cryptic rather than explicit, or precatory rather than mandatory, usually will not achieve that end.

In this case, we need not probe the point too deeply. The forum-selection clause is nose-on-the-face plain; it commits "[a]ll claims, disputes and other matters ... arising out of or relating to [the contract]" to arbitration, and further provides that the agreement to arbitrate "shall be specifically enforceable under prevailing law." In short, the waiver here, particularly when read against the background of the ordinance, is direct, clear, and unavoidable. *See Rosebud Sioux,* 50 F.3d at 563 (explaining that no "magic words" are required to effect an express waiver of tribal sovereign immunity). Consequently, the Authority has surrendered its tribal sovereign immunity in respect to Ninigret's claims arising out of the Village project.

## IV. THE TRIBAL EXHAUSTION DOCTRINE

 The tribal exhaustion doctrine is not jurisdictional in nature, but, rather, is a product of comity and related considerations. *See Iowa Mut. Ins. Co. v. La-Plante,* 480 U.S. 9, 16 n. 8, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). Where applicable, this prudential doctrine has force whether or not an action actually is pending in a tribal court. *See United States v. Tsosie,* 92 F.3d 1037, 1041 (10th Cir.1996); *Craw-*

*ford,* 947 F.2d at 1407. Moreover, the doctrine applies even though the contested claims are to be defined substantively by state or federal law. *See Altheimer,* 983 F.2d at 814; *Buchanan,* 40 F.Supp.2d at 1048.

### A

 The tribal exhaustion doctrine holds that when a colorable claim of tribal court jurisdiction has been asserted, a federal court may (and ordinarily should) give the tribal court precedence and afford it a full and fair opportunity to determine the extent of its own jurisdiction over a particular claim or set of claims. *See El Paso Natural Gas,* 526 U.S. at 483, 119 S.Ct. at 1437; *National Farmers,* 471 U.S. at 856–57, 105 S.Ct. 2447. The doctrine rests on three pillars. First, Congress long has advocated "a policy of supporting tribal self-government and self-determination ... [which] favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." *National Farmers,* 471 U.S. at 856, 105 S.Ct. 2447. Second, exhaustion fosters administrative efficiency. *See id.* Third, exhaustion provides other decisionmakers with the benefit of tribal courts' expertise, thus facilitating further judicial review. *See id.* at 857, 105 S.Ct. 2447.

 To be sure, the tribal exhaustion doctrine does not apply mechanistically to every claim brought by or against an Indian tribe. One possible objection to its application in this situation is that neither the parties nor the district court paid much attention to it. But the parties did brief the issue below, and implied waivers are disfavored in this corner of the jurisprudential world: as a general rule, if a tribe has not explicitly waived exhaustion, courts lack discretion to relieve its litigation adversary of the duty of exhausting tribal remedies before proceeding in a federal forum.[7] *See Allstate Indem. Co. v.*

---

**7.** There is virtually no case law as to the

effectiveness *vel non* of an express disclaimer

*Stump,* 191 F.3d 1071, 1073, *as amended by* 197 F.3d 1031 (9th Cir.1999); *Tsosie,* 92 F.3d at 1041. This deferential view is entirely consistent with "the heightened sensitivity to tribal sovereignty present in federal-tribal comity cases." *Smith v. Moffett,* 947 F.2d 442, 445 (10th Cir.1991). It is also compatible with the federal courts' acknowledged power to investigate the issue of exhaustion of tribal remedies sua sponte. *See id.; cf. Cruz v. Melecio,* 204 F.3d 14, 22 n. 7 (1st Cir.2000) (concluding that court of appeals has power to raise delicate questions of federal-state comity on its own initiative). Hence, we must address the applicability of the doctrine.

**B**

■■■ A second possible objection to the deployment of the tribal exhaustion doctrine is scope-related. Scope determinations hinge, in the first instance, on the subject matter of the contested claim. Civil disputes arising out of the activities of non-Indians on reservation lands almost always require exhaustion if they involve the tribe. *See Iowa Mut.,* 480 U.S. at 18, 107 S.Ct. 971 (noting that jurisdiction over such cases "presumptively lies in the tribal courts"). But where, as here, a dispute arises out of activities conducted elsewhere—the Authority undertook to develop the Village project on land purchased by the Tribe but situated outside the reservation, *see Ninigret,* 32 F.Supp.2d at 499—an inquiring court must make a particularized examination of the facts and circumstances attendant to the dispute in order to determine whether comity suggests a need for exhaustion of tribal remedies as a precursor to federal court adjudication. *See Texaco, Inc. v. Zah,* 5 F.3d 1374, 1378 (10th Cir.1993). This task awaits us.

■■■ To trigger exhaustion, an "off-the-reservation" claim must at a bare minimum impact directly upon tribal affairs.

*See Basil Cook,* 117 F.3d at 66; *Altheimer,* 983 F.2d at 814. This requirement appears to be satisfied here. The Village project entailed the development of low-income housing for members of the Tribe on real estate purchased for that express purpose, and the pact awarded to the appellant was in furtherance of that end. *See Ninigret,* 32 F.Supp.2d at 499–500. Courts regularly have held that a contract dispute between a tribe and an entity doing business with it, concerning the disposition of tribal resources, is a tribal affair for purposes of the exhaustion doctrine. *See, e.g., Basil Cook,* 117 F.3d at 66; *Bruce H. Lien Co. v. Three Affiliated Tribes,* 93 F.3d 1412, 1420 (8th Cir.1996); *see also* Laurie Reynolds, *Exhaustion of Tribal Remedies,* 73 N.C. L.Rev. 1089, 1107 & n. 88 (1995) (citing cases); *cf. Strate v. A–1 Contractors,* 520 U.S. 438, 446, 453, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) (indicating that a tribe's adjudicative jurisdiction covers activities of non-Indians on lands within the reservation owned by non-Indians when they have entered into contracts with the tribe). Since Ninigret's dealings with the Authority bore directly on the use and disposition of tribal resources (land and money), we conclude that this case sufficiently concerns tribal affairs.

■■■ We next measure the case against the tribal exhaustion doctrine's overarching purposes, as identified by the Supreme Court. *See National Farmers,* 471 U.S. at 856–57, 105 S.Ct. 2447. This inquiry tilts sharply in favor of enforcing an exhaustion requirement. For one thing, a tribe's efforts to provide housing to tribal members is fairly obviously an exercise of its governmental functions. *See Weeks,* 797 F.2d at 673–74; *Buchanan,* 40 F.Supp.2d at 1048. For another thing, having a tribal court address, in the first instance, the scope of its jurisdiction over a dispute that stems from actions taken in the course of

of tribal court remedies. Because the record here reveals no explicit waiver or other equiv-

alent circumstance, we have no occasion to pursue that question.

tribal governance promotes efficiency and sensibly allocates scarce judicial resources. *See Bruce H. Lien Co.,* 93 F.3d at 1420. Deferring to the tribal court also promises to yield a record that will enlighten other decisionmakers and afford them the benefit of the tribal court's expertise. *See Basil Cook,* 117 F.3d at 65. Measured against these benchmarks, the case at hand seems to be an excellent candidate for compelled exhaustion.

## C

Although a broadly focused scope-related objection misfires, a more narrowly focused objection looms. The district court resolved the Authority's claim of supervening tribal court jurisdiction by turning directly to the contract's forum-selection clause and passing upon its enforceability, *see Ninigret,* 32 F.Supp.2d at 504–05, thus holding, by implication, that the tribal exhaustion doctrine does not apply to the interpretation of such a provision. There is a difference of opinion, however, as to whether contractual forum-selection clauses escape application of the doctrine. *Compare Basil Cook,* 117 F.3d at 63–64, 69 (affirming application of tribal exhaustion doctrine despite the presence of an arbitration clause in the contract *sub judice* ), *and Snowbird,* 666 F.Supp. at 1444 (holding that the initial interpretation of a contractual forum-selection clause must be made by the tribal court) *with Altheimer,* 983 F.2d at 814–15 (deciding that the tribal exhaustion doctrine did not apply to a forum-selection clause in a contract between a non-Indian corporation and an Indian manufacturing company). Although the question is close, we believe that, under *National Farmers,* the determination of the existence and extent of tribal court jurisdiction must be made with reference to federal law, not with reference to forum-selection provisions that may be contained within the four corners of an underlying contract. *See National Farmers,* 471 U.S. at 855–56, 105 S.Ct.

2447. At that stage, the pivotal question is not which court the parties agreed would have jurisdiction, but which court should, in the first instance, consider the scope of the tribal court's jurisdiction and interpret the pertinent contractual clauses (including any forum-selection proviso). *See Iowa Mut.,* 480 U.S. at 16, 107 S.Ct. 971; *National Farmers,* 471 U.S. at 855–57, 105 S.Ct. 2447. This logic indicates that where, as here, the tribal exhaustion doctrine applies generally to a controversy, an argument that a contractual forum-selection clause either dictates or precludes a tribal forum should not be singled out for special treatment, but should initially be directed to the tribal court. *See Basil Cook,* 117 F.3d at 63–64, 69; *Snowbird,* 666 F.Supp. at 1444.

We also believe that this approach comports with the concern for tribal sovereignty that forms the epicenter of the tribal exhaustion doctrine. *See El Paso Natural Gas,* 526 U.S. at 483, 119 S.Ct. at 1437; *National Farmers,* 471 U.S. at 856, 105 S.Ct. 2447. For the district court to bypass the tribal court and interpret the forum-selection clause itself would place the two judicial systems in direct competition with each other, and thereby undermine the tribal court's authority over tribal affairs. Proper respect for tribal legal institutions counsels convincingly against putting courts on such a collision course. *See Iowa Mut.,* 480 U.S. at 16, 107 S.Ct. 971; *see also National Farmers,* 471 U.S. at 857, 105 S.Ct. 2447 (admonishing a lower federal court to "stay its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction").

## D

Our examination proceeds. Even in instances—like this one—in which the tribal exhaustion doctrine normally would apply, the Supreme Court has not demanded exhaustion "where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, or where the action is patently violative of

express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." *National Farmers*, 471 U.S. at 856 n. 21, 105 S.Ct. 2447 (citations and internal quotation marks omitted). We construe the appellant's somewhat elliptical arguments as an endeavor to enlist two of these exceptions.[8]

■ The appellant's attempt to invoke the futility exception is jejune. Stripped of rhetorical flourishes, its allegation that proceeding before the tribal court would be futile has two components: first, that a tribal court necessarily will favor a tribal agency; and second, that the Narragansetts' tribal court is no more than a subset of the Tribal Council and thus can be expected merely to rubberstamp the Council's earlier decision. Mindful of the skeptical stance taken by other courts toward such allegations, *see, e.g., Iowa Mut.*, 480 U.S. at 19, 107 S.Ct. 971; *A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411, 1417 (9th Cir.1986), we reject them here.

■ The unsupported averment that non-Indians cannot receive a fair hearing in a tribal court flies in the teeth of both congressional policy and the Supreme Court precedents establishing the tribal exhaustion doctrine. The requirements for this exception are rigorous: absent tangible evidence of bias—and none has been proffered here—a party cannot skirt the tribal exhaustion doctrine simply by invoking unfounded stereotypes. *See Duncan*, 27 F.3d at 1301; *A & A Concrete*, 781 F.2d at 1417; *see also Iowa Mut.*, 480 U.S. at 19, 107 S.Ct. 971.

The contention that the Tribal Council's decision necessarily dictates the outcome of a subsequent tribal court adjudication is similarly flawed. After all, the appellant refused to appear for a scheduled hearing and left the Tribal Council—which,

through no fault of its own, had heard only one side of the story—no real choice but to decide the dispute in favor of the Authority. At a contested hearing in which each party presents its version of the truth, the result might well differ. In all events, there is no discernible basis in the record for the appellant's conclusion that the judges of the tribal court (or the members of an arbitration board that it appoints) will march in lockstep with the Tribal Council. Thus, the futility exception eludes the appellant's grasp. *See Buchanan*, 40 F.Supp.2d at 1048; *cf. Gilbert v. City of Cambridge*, 932 F.2d 51, 61 (1st Cir.1991) (noting that, in administrative law cases, the futility exception only can be invoked if the prospect of an adverse decision is demonstrably certain—or nearly so).

■ This leaves the "bad faith" exception. That exception applies, the appellant intimates, because the Authority never volunteered the information that the tribal court was not free-standing, but merely a subset of the Tribal Council. This remonstrance is unavailing. The appellant offers no evidence of affirmative misleading or other misconduct, and, absent such evidence, we must presume the tribal court to be properly constituted, competent, and impartial. *See Duncan*, 27 F.3d at 1301. Merely crying "foul" is not enough to show bad faith. *See A & A Concrete*, 781 F.2d at 1417.

We need go no further. Although claims of futility, bias, bad faith, and the like roll easily off the tongue, they are difficult to sustain. *See* Blake A. Watson, *The Curious Case of Disappearing Federal Jurisdiction over Federal Enforcement of Federal Law*, 80 Marq. L.Rev. 531, 571 n. 173 (1997) (citing examples). Because the appellant has done no more than allege in a wholly conclusory fashion that the tribal forum will prove to be biased in fact and partisan in operation, it cannot avail

**8.** The remaining exception need not concern us. No explicit jurisdictional ukase (e.g., a statute vesting the federal courts with exclusive jurisdiction) interferes here with the wonted operation of the tribal exhaustion doctrine. Thus, the exception is inapropos. *See Basil Cook*, 117 F.3d at 67 (collecting cases); *Kerr–McGee Corp. v. Farley*, 115 F.3d 1498, 1502 (10th Cir.1997).

itself of the *National Farmers* exceptions to the tribal exhaustion doctrine. *See Santa Clara Pueblo,* 436 U.S. at 66, 98 S.Ct. 1670 ("Nonjudicial tribal institutions have also been recognized as competent law-applying bodies."); *Basil Cook,* 117 F.3d at 66 (similar).

## V. FURTHER PROCEEDINGS

■ To this point, our discussion makes manifest that the district court appropriately exercised subject-matter jurisdiction (Part II); that the appellant's claims against the Authority are not pretermitted by tribal sovereign immunity (Part III); and that the tribal exhaustion doctrine applies to this case (Part IV), so that, as a matter of comity, it is for the tribal court, in the first instance, (a) to determine the contours of its own jurisdiction (in the process interpreting the contractual forum-selection clause), and if it determines that it has the authority to proceed, (b) to effectuate its jurisdictional determination by adjudicating the merits of the appellant's claims.

■ Since the concern for exhaustion arises out of comity considerations rather than jurisdictional constraints, remitting the case to the tribal court does not preclude the possibility of review by the federal court at a future date. *See Iowa Mut.,* 480 U.S. at 19, 107 S.Ct. 971; *Brown v. Washoe Hous. Auth.,* 835 F.2d 1327, 1329 (10th Cir.1988). Should the case return to the federal court, all preserved jurisdictional issues (including those related to the tribal court's handling of the forum-selection clause) are subject to plenary district court review. *See Iowa Mut.,* 480 U.S. at 19, 107 S.Ct. 971. Nevertheless, as long as the tribal court has properly defined its own jurisdiction, respect for the tribal court system will bar the relitigation of merits-related issues that were presented to and decided by that court. *See id.; see also* David H. Getches et al., *Federal Indian Law* 528 (4th ed. 1998) ("The federal court should not be tempted beyond the jurisdictional question, even by a tribal court's decision on the merits that it finds questionable.").

There is one more matter of immediate concern. Because of its focus on the forum-selection clause, the district court did not act under Rule 12(b)(1), but, rather, made a Rule 12(b)(6) determination and dismissed the Village project claims with prejudice. *See supra* note 1. Methodologically, this was error, and we therefore vacate the existing judgment. On remand, the district court may, in its discretion, stay the case pending exhaustion of tribal remedies or dismiss it, pursuant to Rule 12(b)(1), without prejudice to refiling after exhaustion. *See Iowa Mut.,* 480 U.S. at 20 n. 14, 107 S.Ct. 971; *National Farmers,* 471 U.S. at 857, 105 S.Ct. 2447. We caution that the exhaustion process demands the good-faith cooperation of all parties. It should, of course, be given a reasonable time to proceed. *See Bruce H. Lien Co.,* 93 F.3d at 1422. If, however, undue delays develop or changed circumstances evolve, the district court may consider permitting the federal court action to proceed or taking such other steps as it may deem advisable. *See id.*

*Vacated and remanded for further proceedings consistent with this opinion. Each party shall bear its own costs.*