268 F.3d 76 (2nd Cir. 2001)
 HILDA GARCIA, PLAINTIFF-APPELLANT,
v.
AKWESASNE HOUSING AUTHORITY AND JOHN RANSOM, DEFENDANTS-APPELLEES.
 Docket No. 00-9029
August Term: 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: April 26, 2001
Decided October 3, 2001
 
 Appeal from a judgment entered by the United States District Court for the Northern District of New York (McAvoy, J.), dismissing claims against an agency of an Indian tribe and an agency official under the tribal exhaustion rule, and dismissing claims against the agency on the alternative ground of tribal sovereign immunity.
 Affirmed in part, and in part vacated and remanded.[Copyrighted Material Omitted]
 Mark A. Schneider, Plattsburgh, Ny, for Plaintiff-Appellant.
 Russell D. Barr, Stowe, Vt, for Defendants-Appellees.
 Before: Jacobs, Parker, and Katzmann, Circuit Judges.
 Dennis Jacobs, Circuit Judge.
 
 
 1
 This suit arises from a decision by the Akwesasne Housing Authority, ("AHA"), an agency of the St. Regis Mohawk Indian Tribe, to terminate the employment of Hilda Garcia, the agency's Executive Director. Garcia commenced suit in the United States District Court for the Northern District of New York (McAvoy, J.) against the AHA and John Ransom, the Chairman of the AHA's Board of Commissioners, alleging discrimination, breach of contract and tort claims under (variously) federal and state law. The district court dismissed the action under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the grounds that (i) Garcia's claims against both the AHA and Ransom must first be litigated in the courts of the St. Regis Tribe under the tribal exhaustion rule, and (ii) the AHA, in any event, enjoys tribal sovereign immunity. On appeal, Garcia challenges both grounds of dismissal.
 
 BACKGROUND
 
 2
 While the facts bearing upon the underlying merits will no doubt be disputed, the defendants do not contest--and we therefore accept as true--the procedural facts contained in the complaint that are relevant to the appeal. The AHA was created pursuant to a resolution of the St. Regis Tribal Council. It provides public housing on the Akwesasne Reservation using federal funds disbursed by the United States Department of Housing and Urban Development ("HUD"). At all relevant times, Ransom chaired the AHA's Board of Commissioners.
 
 
 3
 The AHA hired Garcia as its Executive Director in 1985. She is not a member of the St. Regis Mohawk Tribe. For reasons that are hotly disputed by the parties, the AHA terminated her in June 1995.
 
 
 4
 Garcia challenged her termination by filing a five-count pleading in the district court. The complaint charges both the AHA and Ransom with violations of federal and state laws. Garcia is seeking compensatory and punitive damages, attorney's fees and costs, and injunctive relief in the form of reinstatement.
 
 
 5
 Count one of the pleading alleges that Garcia was fired by reason of age in violation of the Age Discrimination in Employment Act, ("ADEA"), and was replaced by a "younger man who appears to be in his middle `40s.'" It is alleged (and undisputed for present purposes) that she received a "right to sue" letter from the Equal Employment Opportunity Commission ("EEOC") for the ADEA claim, and that she filed suit within the statutorily-mandated 90-day period following her receipt of the letter. See 29 U.S.C. § 626.
 
 
 6
 Count two alleges that the termination was effected without due process and as retaliation for (inter alia) her exercise of First Amendment rights in reporting to HUD that Ransom had engaged in self-dealing in violation of federal regulations. Garcia invokes 42 U.S.C. § 1983 (which prohibits deprivations of constitutional rights by persons acting "under color of state law") and Title I of the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1301-03 (which provides inter alia that "[n]o Indian tribe" shall "make or enforce any law... abridging the freedom of speech... or the right of the people... to petition for a redress of grievances," or "deprive any person of liberty or property without due process of law").
 
 
 7
 Counts three and four allege principally that the AHA breached an implied contract under state law by terminating Garcia in violation of the AHA's formal, written policies.
 
 
 8
 Finally, count five alleges that Ransom intentionally interfered with Garcia's employment contract with the AHA, acting "outside the scope of his authority" and "for personal, retaliatory, and unlawful reasons."
 
 
 9
 Defendants moved to dismiss the complaint for lack of subject matter jurisdiction, on the grounds that (1) the claims could not be presented in federal court because Garcia had not presented them to a tribal court in accordance with the tribal exhaustion rule, and (2) the claims were barred in any event by the doctrine of tribal sovereign immunity.
 
 
 10
 The district court held that it "lack[ed] [subject matter] jurisdiction" over the causes of action against both the AHA and Ransom because Garcia had not yet exhausted the claims in a tribal court. See Garcia v. Akwesasne Hous. Auth., 105 F. Supp. 2d 12, 21 & n.8 (N.D.N.Y. 2000). The court also ruled that the claims against defendant AHA had to be dismissed on the alternative ground of tribal sovereign immunity. See id. at 15-17. Following the entry of final judgment dismissing the complaint, Garcia filed this appeal.
 
 DISCUSSION
 
 11
 We consider tribal exhaustion first; sovereign immunity second.
 
 I.
 
 12
 The doctrine of federal court abstention now known as the "tribal exhaustion rule" was announced in National Farmers Union Insurance Cos. v. Crow Tribe, 471 U.S. 845 (1985). In general terms, the doctrine requires that federal courts abstain from hearing certain claims relating to Indian tribes until the plaintiff has first exhausted those claims in a tribal court. The defendants in this case argue, and the district court agreed, that the tribal exhaustion rule mandates dismissal of Garcia's claims against both the AHA and Ransom. We review the scope of the tribal exhaustion rule de novo. Bowen v. Doyle, 230 F.3d 525, 530 (2d Cir. 2000).
 
 A. Subject Matter Jurisdiction
 
 13
 As a threshold matter, the district court erred by treating abstention on this ground as a matter of subject matter jurisdiction. See Garcia, 105 F. Supp. 2d at 21. Exhaustion in appropriate circumstances "is required as a matter of comity, not as a jurisdictional prerequisite." Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 16 n.8 (1987). Garcia alleged federal question jurisdiction over her federal law claims, see 28 U.S.C. § 1331, and supplemental jurisdiction over her state-law claims, see id. § 1367(a). (Garcia's assertion of diversity jurisdiction is dubious.[1]) Because the tribal exhaustion rule does not impair jurisdiction, and instead is "analogous to principles of abstention articulated in Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976)," LaPlante, 480 U.S. at 16 n.8, the doctrine must be interpreted narrowly in light of the "virtually unflagging obligation of federal courts to exercise the jurisdiction given them." Colorado River, 424 U.S. at 817.
 
 B. The Reach of the Doctrine
 
 14
 This Court and the Supreme Court have required abstention under the tribal exhaustion rule on just three occasions: LaPlante, 480 U.S. at 14-20; National Farmers, 471 U.S. at 853-56; and Basil Cook Enters. v. St. Regis Mohawk Tribe, 117 F.3d 61 (2d Cir. 1997). In each instance, the plaintiff was litigating a previously-filed, ongoing tribal court action, and was asking the federal court to interfere with those tribal proceedings. These cases are procedurally distinguishable from Garcia's case because Garcia's claims have not been in tribal court. We conclude that the reasoning of these cases and the policy considerations that underlie them militate in favor of the opposite result in this case: the comity and deference owed to a tribal court that is adjudicating an intra-tribal dispute under tribal law does not compel abstention by a federal court where a non-member asserts state and federal claims and nothing is pending in the tribal court.
 
 
 15
 In the seminal tribal exhaustion case, National Farmers, the federal court granted an injunction against enforcement of a default judgment entered in a tribal court, on the ground that the tribal court lacked subject matter jurisdiction over the defaulted claim. See National Farmers, 471 U.S. at 848-49. The Supreme Court held that even though tribal court jurisdiction presented a question of federal law, see National Farmers, 471 U.S. at 853; 28 U.S.C. § 1331, the federal court was required to stay its hand because the examination of the tribal court's jurisdiction "should be conducted in the first instance in the Tribal Court itself." Id. at 850-53, 856. The motion for an injunction could be entertained in federal court, but only after the federal court plaintiffs exhausted the jurisdictional argument in the tribal judicial system.
 
 
 16
 In LaPlante, the Supreme Court considered "whether a federal court may exercise diversity jurisdiction before the tribal court system has [had] an opportunity to determine its own jurisdiction." LaPlante, 480 U.S. at 11. The federal court plaintiff was an insurer that had been named as a defendant in an ongoing tribal court proceeding. In the tribal forum, the insurer lost a jurisdictional challenge. While awaiting tribal appellate review, the insurer commenced a federal diversity suit against all the other parties to the tribal court proceeding, and sought a declaration of "tribal law" on an issue that would have been dispositive of an affirmative defense raised in the tribal forum. Id. at 11-13 & n.3; see also id. at 22 n.* (Stevens, J., concurring in part and dissenting in part) (noting that the majority "seems to assume that the merits of this controversy are governed by `tribal law'").
 
 
 17
 The Court held that respect for tribal self-government required the federal judiciary "to give the tribal court a `full opportunity to determine its own jurisdiction.'" Id. at 16 (quoting National Farmers, 471 U.S. at 857); see also Strate v. A-1 Contractors, 520 U.S. 438, 451 (1997) (interpreting LaPlante). Adjudication of the affirmative defense by a non-tribal court would infringe "upon tribal law-making authority, because tribal courts are best qualified to interpret and apply tribal law." LaPlante, 480 U.S. at 16. Placing emphasis on the holding in National Farmers, the LaPlante opinion added that the insurer eventually would be permitted to bring a federal court challenge to the tribal court's jurisdiction, but only after pursuing all available appeals within the tribal judicial system. See id. at 16-17, 19 & n.12.
 
 
 18
 This Court has had a single occasion to rule on the exhaustion of tribal remedies. In that case, the federal court plaintiffs sought both to enjoin a previously-filed tribal court suit against them (an analog to National Farmers) and to obtain rulings on the merits of issues pending in the tribal forum (an analog to LaPlante). See Basil Cook Enters., 117 F.3d at 64. Applying the two foundational Supreme Court cases, we affirmed the district court's decision to "stay[] further proceedings in federal court pending the Tribal Court's determination of jurisdiction." Id. at 64, 65-69.
 
 
 19
 The Supreme Court recently explained: "Exhaustion was appropriate in [both National Farmers and LaPlante] because `Congress is committed to a policy of supporting tribal self-government... [which] favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge.'" El Paso Natural Gas Co. v. Netzsosie, 526 U.S. 473, 484 (1999) (quoting National Farmers, 471 U.S. at 856) (emphasis added). We have expressed the "general principle" as follows: "[P]arties who challenge, under federal law, the jurisdiction of a tribal court to entertain a cause of action must first present their claim to the tribal court before seeking to defeat tribal jurisdiction in any collateral or parallel federal court proceeding." Basil Cook Enters., 117 F.3d at 65.
 
 
 20
 These cases bar interference by federal courts to defeat or circumvent the ongoing exercise of jurisdiction by tribal courts; Garcia's claims, however, are pending nowhere but in the Northern District of New York. Other circuits have required abstention even where no proceeding was pending in tribal court. See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 31 (1st Cir. 2000) ("Where applicable, this prudential doctrine has force whether or not an action actually is pending in a tribal court."); United States v. Tsosie, 92 F.3d 1037, 1041 (10th Cir. 1996) ("[T]he exhaustion rule does not require an action to be pending in tribal court."); Crawford v. Genuine Parts Co., 947 F.2d 1405, 1407 (9th Cir. 1991) (same); see generally Blake A. Watson, The Curious Case of Disappearing Federal Jurisdiction over Federal Enforcement of Federal Law: A Vehicle for Reassessment of the Tribal Exhaustion / Abstention Doctrine, 80 Marq. L. Rev. 531, 579-80 (1997). These courts impose the exhaustion rule in any action over which a tribal court might have had "concurrent jurisdiction" if the plaintiff had chosen the tribal forum. Tsosie, 92 F.3d at 1042; see also Crawford, 947 F.2d at 1407; Ninigret Dev. Corp., 207 F.3d at 31. Indeed, the Ninth Circuit views the absence of a pending tribal suit to be "irrelevant." Crawford, 947 F.2d at 1407.
 
 
 21
 It is unnecessary for us now to decide categorically whether and how far the doctrine of tribal exhaustion should be extended beyond the scope of its application to cases by the Supreme Court. The Seventh Circuit has observed that "the two Supreme Court cases dealt only with the situation where a tribal court's jurisdiction over a dispute has been challenged by a later-filed action in federal court.... [However,] the policies underlying the two cases seem broader than this narrow context." Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803, 814 (7th Cir. 1993). We agree. And we therefore consider whether these "broader" policies and themes--for example, the "policy of supporting tribal self-government and self-determination," National Farmers, 471 U.S. at 856, the recognition that a "federal court's exercise of jurisdiction over matters relating to reservation affairs can... impair the authority of tribal courts," LaPlante, 480 U.S. at 15, and the view that tribal courts "play a vital role in tribal self-government," id. at 14 (see also Altheimer & Gray, 983 F.2d at 813-14)--militate in favor of an expansion of the doctrine in this case. We conclude that they do not.
 
 C. Garcia's Claim
 
 22
 Several circumstances in this case, considered together, militate against abstention in this case, and suggest deference instead to the competing doctrine that a federal court must fulfill its "virtually unflagging obligation... to exercise [its] jurisdiction." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).
 
 1. Existence of the Tribal Court
 
 23
 The appellees argue deference to the tribal forum, and identify the tribal forum as the Tribal Council. Appellees' Brief at 36 n.14. However, we have recognized that the St. Regis Mohawk tribe has a tripartite government and that the Tribal Council is the legislative branch. See Basil Cook Enters., 117 F.3d at 67. Apparently in 1996 or 1997, an independent Tribal Court was being organized pursuant to recent constitutional reform. See id. at 64, 67-68; Basil Cook Enters. v. St. Regis Mohawk Tribe, 914 F. Supp. 839, 842 (N.D.N.Y. 1996). But in May 1997, Chief Judge MacAvoy found in an unrelated case that tribal court exhaustion would be futile because the St. Regis Mohawk tribal court was "no longer operative." MacEwen Petroleum, Inc. v. Tarbell, 173 F.R.D. 36, 41 (N.D.N.Y. 1992). Subsequently, in another episode in the Basil Cook litigation, Chief Judge MacAvoy received an affidavit from the Tribal Court Admistrator that the court "has always remained open," Basil Cook Enters. v. St. Regis Mohawk Tribe, 26 F. Supp. 2d 446, 448 (N.D.N.Y. 1998), and a similar statement by letter from Chief Judge Deom of the Tribal Court, see id. at 449.
 
 
 24
 It appears from published opinions that a tribal court has existed and may exist now. However, appellees in this case seek remand to the Tribal Council itself. Abstention would result in some uncertainty as to the tribal forum for resolution of this controversy.[2] In any event, no dispute is currently being pursued in any tribal forum. Moreover, neither party in this proceeding has challenged the authority of the tribal court to act. Therefore, the existence of a federal proceeding does not implicate or in any way impair the authority of the tribal court to proceed. If a tribal proceeding were pending, our analysis might well be different.
 
 2. Non-Tribal Plaintiff
 
 25
 The party seeking relief in federal court--Garcia--is not a member of the tribe that she is suing; the dispute is therefore not intra-tribal. See Tsosie, 92 F.3d at 1042-43 (finding that exhaustion was required in part because "the dispute here is between two Navajo Indians").
 
 3. Non-Tribal Law
 
 26
 Garcia's theories of liability are grounded (if anywhere) on federal and state law, not "tribal law."[3] LaPlante, 480 U.S. at 16; see also Altheimer & Gray, 983 F.2d at 814 (refusing to require abstention because inter alia "the dispute does not concern a tribal ordinance as much as it does state and federal law"). This factor seems particularly important in light of the Supreme Court's recent opinion in El Paso Natural Gas Co. v. Netzsosie, 526 U.S. 473, 484 (1999).
 
 
 27
 In El Paso Natural Gas, Navajos sued in tribal court, alleging that atomic energy companies were liable under Navajo tort law for injuries resulting from the mining of uranium on the Navajo Indian Reservation. See id. at 477. The companies countered by bringing a federal suit under the Price-Anderson Act, which (i) preempts all claims arising out of a "nuclear incident," 42 U.S.C. § 2014(w); (ii) makes such claims removable to federal court from state court; and (iii) provides that a federal judge must determine whether the Act applies in cases where removal is contested. See El Paso Natural Gas, 526 U.S. at 484-85; 42 U.S.C. § 2210(n)(2). The lower courts abstained under the tribal exhaustion rule. See El Paso Natural Gas, 526 U.S. at 478. Reversing, the Supreme Court held that the applicability of the Price-Anderson Act must be decided in federal court, and suggested that application of the federal statute would require a transfer of the liability claims from the tribal court to the federal forum. See id. at 483 n.5, 487-88; cf. id. at 486 n.7 (noting the "rare" provisions for removal in the Act's preemption section and suggesting that "the existence of a federal preemption defense in the more usual sense would [not] affect the logic of tribal exhaustion").
 
 
 28
 The opening paragraph of El Paso Natural Gas can be read to say that the tribal exhaustion rule does not require abstention where the underlying, substantive claim would be removable to federal court if brought initially in state court.[4] Since Garcia's claims would be removable if brought initially in a state court, see 28 U.S.C. § 1441(a)-(c), El Paso Natural Gas offers a potential alternative basis for our ruling in this case. We do not rely on El Paso Natural Gas, however, because that opinion elsewhere emphasizes and relies upon the extraordinarily powerful congressional preference that nuclear accident claims be adjudicated in federal court, and it is therefore possible that the opinion is statute-specific. See El Paso Natural Gas, 526 U.S. at 486 (noting that the Act "provides clear indications of the congressional aims of speed and efficiency").
 
 
 29
 *******
 
 
 30
 The foregoing circumstances are determinative in the absence of a competing proceeding in a tribal court. We do not decide whether these circumstances would control the outcome if a tribal proceeding had been begun (and a finding were made that it was pending in a Tribal Court constituted to hear it), or even if such proceeding were started after the federal suit was filed. We hold that where no ongoing tribal proceeding exists, and a non-member of the tribe properly invokes the jurisdiction of a federal court to litigate non-tribal law, the tribal exhaustion rule does not mandate abstention, and the district court must therefore fulfill its unflagging obligation to exercise its discretion. The district court's contrary holding was error.
 
 II.
 
 31
 On a motion invoking sovereign immunity to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists. See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). We review the district court's "factual findings for clear error and legal conclusions de novo." Id. (internal quotation omitted). In this case, the pertinent facts are undisputed.
 
 A. Claims Against the AHA
 
 32
 As a matter of federal common law, an Indian tribe enjoys sovereign immunity from suit except where "Congress has authorized the suit or the tribe has waived its immunity." Kiowa Tribe v. Manufacturing Techs., Inc., 523 U.S. 751, 754 (1998); Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 356-57 (2d Cir. 2000). Garcia concedes that the AHA, as an agency of the St. Regis Tribe, enjoys the same presumption of immunity. See Bassett, 204 F.3d at 358. [Blue 7] However, she argues that both exceptions to the immunity principle apply to this case. We consider her two arguments in turn.
 
 1. Congressional Abrogation
 
 33
 "[C]ongressional abrogation of tribal immunity, like congressional abrogation of other forms of sovereign immunity, `cannot be implied but must be unequivocally expressed.'" Id. at 356-57 (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978)). Garcia finds such unequivocal expressions in the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. §§ 4101-4243, the statute that provides the AHA with federal funds, and in the NAHASDA's implementing regulations. We do not.
 
 
 34
 Garcia points first to 25 U.S.C. § 4115, which concerns environmental reviews of federally-funded Indian housing projects. An officer of the St. Regis Tribe has certified, pursuant to the section, that the tribe will "assume all of the responsibilities" relating to certain federal environmental laws, id. § 4115(a)-(c), and that "the certifying officer... consents to assume the status of a responsible Federal official under the National Environmental Policy Act... and... consents on behalf of the tribe and such officer to accept the jurisdiction of the Federal courts for the purpose of enforcement of the responsibilities of the certifying officer as such an official," id. § 4115(c)(4)(A)-(B) (emphasis added). This passage is limited to environmental responsibilities, and does not bear Garcia's construction of it as a mandated consent to suit that abrogates the tribe's sovereign immunity against her claims.
 
 
 35
 Garcia also points to 25 U.S.C. § 4161(c), which permits the Attorney General of the United States to institute a civil action (following a referral from the Secretary of Housing and Urban Development) to enforce compliance with NAHASDA. Potential remedies for noncompliance include recovery of block grant funds. See id. This provision does not assist Garcia: she is not the Attorney General; and the statute cannot be an abrogation of sovereign immunity because, in the first place, tribes do not enjoy sovereign immunity from suit by the United States. See Reich v. Mashantucket Sand & Gravel, 95 F.3d 174, 182 (2d Cir. 1996).
 
 
 36
 Finally, Garcia contends that we should find a pertinent abrogation in one of NAHASDA's implementing regulations. According to Garcia, 24 C.F.R. § 1000.12 "explicitly provides that the [ADEA] and the Indian Civil Rights Act (`ICRA') do apply to recipients" of NAHASDA block grants. The regulation does require recipients to comply with certain federal laws, but we see no congressional abrogation of tribal sovereign immunity.
 
 
 37
 To begin with, the regulation mentions the Age Discrimination Act of 1975, see 42 U.S.C. §§ 6101-6107, not the ADEA, see 29 U.S.C. §§ 621-34, which is the age discrimination statute invoked in Garcia's complaint.[5] Regardless of whether the substantive norms of the ICRA, the ADEA, and the Age Discrimination Act all apply to tribes, none of the laws abrogates tribal sovereign immunity from suit. The Supreme Court has so held with respect to the ICRA. See Santa Clara Pueblo, 436 U.S. at 59. ("[S]uits against the tribe under the ICRA are barred by its sovereign immunity from suit."). And in the absence of "any unequivocal expression of contrary legislative intent," id., we reach the same conclusion with respect to the ADEA and Age Discrimination Act. Neither statute makes any reference whatever to the "amenity of Indian tribes to suit." Florida Paraplegic Ass'n. v. Miccosukee Tribe, 166 F.3d 1126, 1133 (11th Cir. 1999) (finding no abrogation of tribal immunity under Title III of the Americans with Disabilities Act); cf. 42 U.S.C. § 2000d-7 (expressing congressional intent to waive state sovereign immunity to suit under the Age Discrimination Act); Lane v. Pena, 518 U.S. 187, 198-200 (1996) (§ 2000d-7's "ambiguous reference" to the existence of remedies under inter alia the Age Discrimination Act against `public... entit[ies]'" did not waive the Federal Government's sovereign immunity).
 
 2. Waiver of Immunity
 
 38
 Even where Congress has not abrogated immunity, a tribe may voluntarily subject itself to suit by issuing a "clear" waiver. C & L Enters. v. Citizen Band Potawatomi Indian Tribe, 121 S. Ct. 1589, 1594 (2001). Garcia claims to have found a sufficient waiver in a "sue and be sued" clause in the AHA's enabling Tribal Ordinance:
 
 
 39
 The [Tribal] Council hereby gives its irrevocable consent to allowing the [AHA] to sue and be sued in its corporate name, upon any contract, claim or obligation arising out of its activities under this ordinance and hereby authorizes the [AHA] to agree by contract to waive any immunity from suit which it might otherwise have....
 
 
 40
 Garcia v. Akwesasne Hous. Auth., 105 F. Supp. 2d 12, 15 (N.D.N.Y. 2000) (emphasis added). We first consider the meaning of the "sue and be sued" clause in isolation, then address what (if anything) we can learn from the context in which the clause appears.
 
 
 41
 The Supreme Court recently noted that "the law governing waivers of immunity by foreign sovereigns" is instructive for a court considering an asserted waiver of tribal immunity. C & L Enters., 121 S. Ct. at 1595 n.3 (emphasis added). The Court has reserved decision on "whether parallel principles govern state and tribal waivers of immunity." Id. at 1596 n.4 (emphasis added). But cf. Blatchford v. Native Village, 501 U.S. 775, 782 (1991) (noting that "Indian tribes are more like States than foreign sovereigns... in some respects"). In any event, however, courts consistently have applied two complementary principles to waivers: (1) a sovereign's waiver must be unambiguous, and (2) a sovereign's interest "encompasses not merely whether it may be sued, but where it may be sued." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985) (emphasis in the original) (internal quotations omitted) (state sovereign immunity); see Corzo v. Banco Central de Reserva del Peru, 243 F.3d 519, 523 (9th Cir. 2001) (foreign sovereign immunity) ("[W]hile an entity may be amenable to suit in its home country under some circumstances, it does not necessarily follow that it lacks sovereign immunity from suit in the United States.").
 
 
 42
 Applying those principles, courts considering a bare "sue and be sued" clause in the contexts of foreign and state sovereign immunity have arrived at the same conclusion: the clause constitutes a waiver of immunity (if at all) only in the courts of the sovereign. See College Sav. Bank v. Florida Prepaid Post-secondary Educ. Expense Bd., 527 U.S. 666, 676 (1999) (noting that a state does not "consent to suit in federal court merely by stating its intention to `sue and be sued'") (emphasis added); Scanlon, 473 U.S. at 241 (noting that "[a]lthough a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment"); Florida Dep't of Health & Rehabilitative Servs. v. Florida Nursing Home Ass'n, 450 U.S. 147, 149 (1981) (per curiam) (construing a Florida statute providing that a state agency was "a `body corporate' with the capacity to `sue and be sued'"); Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 538 (5th Cir. 1992) ("sue and be sued" clause in Mexican agency's enabling legislation permitted "some judicial remedies" against the agency, but did not expose it "to the subject matter jurisdiction of courts of the United States"); Dayton v. Czechoslovak Socialist Republic, 834 F.2d 203, 205-06 (D.C. Cir. 1987) (Ruth Bader Ginsburg, J.) ("[N]o intelligent waiver of a foreign sovereign's immunity is fairly extracted from endowment of a state trading company with the capacity to sue and be sued."). As some of the authorities on foreign sovereign immunity point out, the House Report on the Foreign Sovereign Immunity Act states that agencies of foreign states entitled to immunity include "a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name." H.R. Rep. No. 1487 at 15 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6613-14 (emphasis added).
 
 
 43
 When the tribal ordinance is read in the light of these authorities, it becomes clear that the additional authority granted to the AHA--to waive by contract "any immunity from suit which it might otherwise have"--describes the power to waive the agency's immunity in courts outside the reservation. Because the ordinance does not waive the AHA's immunity to suit in federal court, and because Garcia did not contract for such a waiver, the ordinance has no effect on immunity in this case. The First and Eighth circuits have considered similar tribal ordinances and reached the same result as we do today, though based on slightly different reasoning. See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 30 (1st Cir. 2000); Dillon v. Yankton Sioux Tribe Hous. Auth., 144 F.3d 581, 583-84 (8th Cir. 1998).
 
 
 44
 B. Claims Against Ransom, as an Officer of the AHA
 
 
 45
 Although the AHA itself cannot be made to pay damages and cannot even be named as a defendant, Garcia can still obtain injunctive relief against it by suing an agency officer in his official capacity. See Santa Clara Pueblo v. Martinez, 436 U.S. at 59 (citing the doctrine of Ex parte Young, 209 U.S. 123 (1908)); Puyallup Tribe v. Dep't of Game, 433 U.S. 165, 171-72 (1977); Bassett v. Mashantucket Pequot Tribe, 204 F.3d at 358-59 (2d Cir. 2000); cf. Board of Trustees v. Garrett, 121 S. Ct. 955, 968 n.9 (2001) (even though state sovereign immunity precludes damages suits against states under Title I of the Americans with Disabilities Act, the doctrine of Ex parte Young permits private plaintiffs to sue a state "for injunctive relief").
 
 
 46
 There are (at least) two important qualifications. First, any law under which Garcia seeks injunctive relief must apply substantively to the agency. For example, she would not be permitted to pursue injunctive relief if she had sued the AHA under Title VII of the Civil Rights Act, because that law specifically exempts "an Indian tribe" from its prohibitions. 42 U.S.C. § 2000e(b). Second, Garcia must have a private cause of action to enforce the substantive rule. The Indian Civil Rights Act, for instance, imposes numerous substantive obligations on tribal governments but does not explicitly provide a private cause of action in federal court except via the writ of habeas corpus. See Poodry v. Tonawanda Band, 85 F.3d 874 (2d Cir. 1996). Garcia should be granted leave to amend her complaint to clarify her claims for injunctive relief against the agency in conformance with these principles, if she can.
 
 
 47
 Finally, as to Garcia's claims brought against Ransom in a personal capacity, the district court reviewed a variety of issues bearing on this subject, but ultimately decided only that these claims were barred because Garcia had failed to exhaust her remedies before the Tribal Court or the Tribal Council. See Garcia v. Akwesasne Hous. Auth., 105 F. Supp. 2d 12, 17-21 (N.D.N.Y. 2000). As we have held that abstention on that ground is unavailable, see supra Sec. I, we vacate the district court's dismissal of Garcia's claims for money damages against Ransom in his personal capacity, and remand for the district court to consider whether other legal rules and doctrines defeat or preserve those claims--assuming that Garcia is inclined to pursue her remaining claims in the federal forum.
 
 CONCLUSION
 
 48
 We affirm the judgment of the district court insofar as it dismissed all claims (1) seeking damages from the AHA and (2) naming the AHA as a defendant. In remaining respects, the judgment is vacated and the action is remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 NOTES:
 
 
 [1]
 The amended complaint, which asserts diversity of citizenship jurisdiction, see 28 U.S.C. § 1332, does not specifically allege the citizenship of each party. Cf. Romanella v. Hayward, 933 F. Supp. 163, 167 (D. Conn. 1996) ("[A] native American tribe is not a citizen of a state within the meaning of 28 U.S.C. § 1332 and may not sue or be sued in federal court under the court's diversity jurisdiction."). The pleading states only that Garcia is a dual U.S.-Canadian citizen, who "permanently" resides in Canada but currently lives in Sells, Arizona.
 
 
 [2]
 The concurrence would rest the decision entirely on the absence of a finding that a tribal court presently exists. That line of reasoning leads, however, to intractable questions such as: (1) Does tribal adjudication require a tribal court? (2) Can disputes be adjudicated by a Tribal Council? (3) Are the tribal nations required to observe separation of powers? (3) Can a sufficient forum separate from the Tribal Council be appointed ad hoc? (4) Can the adjudicative power of the tribal nation be exercised by compelling arbitration?
 If either of the parties had taken the initiative to seek adjudication of this dispute within the tribal nation, we might learn which of these questions, or others, would arise.
 
 
 [3]
 Defendants do not contest the district court's characterization of Garcia's common law claims as "state-based." Garcia v. Akwesasne Hous. Auth., 105 F. Supp. 2d 12, 14 (N.D.N.Y. 2000). And defendants themselves have referred to the tortious interference with contract claim as being "founded entirely on state law." Reply Memorandum of Law in Support of Motion to Dismiss at 10.
 
 
 [4]
 The opening paragraph of El Paso Natural Gas is as follows:
 The issue is whether the judicially created doctrine of tribal court exhaustion, requiring a district court to stay its hand while a tribal court determines its own jurisdiction, should apply in this case, which if brought in a state court would be subject to removal. We think the exhaustion doctrine should not extend so far.
 El Paso Natural Gas, 526 U.S. at 476.
 
 
 [5]
 These two laws apply to different entities, compare 42 U.S.C. § 6102 (programs or activities receiving federal financial assistance) with 29 U.S.C. § 623 ("employers," "employment agencies," and "labor organizations,"), and provide markedly different enforcement mechanisms, compare 42 U.S.C. § 6104 with 29 U.S.C. § 626. In any event, even assuming arguendo that a regulation can abrogate immunity, Garcia's argument suffers from a fatal defect: "the fact that a statute applies to Indian tribes does not mean that Congress abrogated tribal immunity in adopting it." Bassett, 204 F.3d at 357; see also Kiowa Tribe v. Manufacturing Tech., Inc., 523 U.S. 751, 755 (1998) ("There is a difference between the right to demand compliance with state laws [by an Indian tribe] and the means available to enforce them."); Florida Paraplegic Ass'n v. Miccosukee Tribe, 166 F.3d 1126, 1130 (11th Cir. 1999) ("[W]hether an Indian tribe is subject to a statute and whether the tribe may be sued for violating the statute are two entirely different questions.").
 
 
 
 49
 KATZMANN, Circuit Judge, concurring in part and concurring in judgment in part:
 
 
 50
 I join the judgment of the court vacating the dismissal on tribal exhaustion grounds, but would reach this result in a different way. Similarly, I agree with the court's reasoning and conclusions regarding the alleged sovereign immunity waiver in the ordinance creating the tribal housing authority, but write separately to express some concerns arising from the particular facts of this case. I concur fully in the thoughtful majority opinion in all other respects.
 
 
 51
 With regard to the tribal exhaustion issue, I would hold that the plaintiff should not have to exhaust her claims in Tribal Court because the defendants have not asserted that a Tribal Court as such exists. Exhaustion would thus be futile. See Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 19 n.12 (1987) (recognizing the futility exception to the tribal exhaustion rule). The defendants seek remand to the Tribal Council (the tribe's legislative body) by asserting that this body is and has always been the tribe's judicial forum as well. As detailed above, see supra § I.C.1, the accuracy of this representation is open to debate, to say the least. The question whether a Tribal Court exists is analytically prior to the question whether Tribal Court exhaustion is required in any given case. Since the defendants do not contend that there exists a Tribal Court as such at this time, we should vacate the dismissal without reaching the exhaustion issue.
 
 
 52
 The federal circuits which adjudicate the majority of the Indian law cases in this country have all held that the necessity of tribal exhaustion does not turn on whether a case is also pending in Tribal Court. See, e.g., Duncan Energy Co. v. Three Affiliated Tribes, 27 F.3d 1294, 1299-01 (8th Cir. 1994), cert. denied, 513 U.S. 1103 (1995); Texaco, Inc. v. Zah, 5 F.3d 1374, 1376 (10th Cir. 1993); Burlington Northern R.R. v. Crow Tribal Council, 940 F.2d 1239, 1246 (9th Cir. 1991); see also Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Housing Auth., 207 F.3d 21, 31 (1st Cir. 2000). These circuits all hold that if a suit is arguably within the jurisdiction of the Tribal Court, it must first be filed in Tribal Court.
 
 
 53
 I agree that the Supreme Court's exhaustion case law does not mandate this position, but it certainly does not mandate the holding of the majority opinion either. Lacking any controlling Supreme Court precedent, we must be guided by the policies underlying the tribal exhaustion doctrine. I would not condition exhaustion on what could effectively be a race to the courthouse or the ability of a potential defendant to anticipate litigation and craft a ripe claim for declaratory relief. These grounds appear to me to be quite different from the policies underlying the exhaustion doctrine, which are respecting tribal sovereignty, promoting tribal self-governance, and receiving the benefits of Tribal Court expertise with tribal law. See El Paso Natural Gas v. Neztsosie, 526 U.S. 473, 483-84 (1999); Strate v. A-1 Contractors, 520 U.S. 438, 450-51 (1997); LaPlante, 480 U.S. at 14-15; National Farmers Union Ins. Cos. v. Crow Tribe, 471 U.S. 845, 856-57 (1985).
 
 
 54
 Nor am I convinced of the weight to be given to the fact that this case involves a non-tribal plaintiff. See supra § I.C.2. The St. Regis Mohawk tribe would have legislative and adjudicatory jurisdiction over this case because it involves actions by the Tribal Council and a tribal official on tribal land concerning a business agreement entered into with a tribal agency. See Ninigret, 207 F.3d at 32-33; see also Nevada v. Hicks, 121 S.Ct. 2304, 2310 n.3 (2001) (tribes have jurisdiction over nonmembers who enter into consensual relationships with the tribe or its members); Atkinson Trading Co. v. Shirley, 121 S.Ct. 1825, 1832-33 (2001) (same); Strate, 520 U.S. at 457 (a business contract qualifies as a "consensual relationship"). I also do not grasp the particular relevance in this case of the fact that non-tribal law is involved. See supra § I.C.3. "[T]he [exhaustion] doctrine applies even though the contested claims are to be defined substantively by state or federal law." Ninigret, 207 F.3d at 31. El Paso's discussion is not controlling here because that case involved a uniquely important federal interest and clear Congressional preference for a federal forum. In the usual case, Tribal Courts are competent to decide state and federal law claims. See El Paso Natural Gas, 526 U.S. at 485 n.7; Altheimer & Gray v. Sioux Manuf. Corp., 983 F.2d 803, 814 (7th Cir.), cert. denied, 510 U.S. 1019 (1993). This dispute falls within tribal jurisdiction and exhaustion should therefore be required. I would prefer to avoid deciding the issue in the manner accomplished by the majority opinion and instead vacate the district court's dismissal on exhaustion grounds simply on the basis that the defendants do not contend that a Tribal Court as such presently exists.
 
 
 55
 Turning to sovereign immunity, I recognize the fundamental soundness of the general legal propositions expounded by the court above. See supra § II.A.2. Going forward from this point in time, the court's reading of the tribal ordinance on sovereign immunity should be fair and workable. Employees of the housing authority, and individuals and entities doing business with it, are now on notice that the tribe has only waived sovereign immunity for suit in tribal forums, such as they are. Any additional waiver granting the right to sue in federal court will have to be negotiated in advance with the tribe.
 
 
 56
 However, the particular facts of this case raise some concerns. Limitation to suit in tribal forums is adequate in theory, but the specific history of the St. Regis Mohawk judicial system complicates the issue. Apparently -- accepting the defendants' representations made in their brief to this court -- the sole tribal forum which can hear a legal claim at present is the Tribal Council. When, as in this case, actions of this Tribal Council form part of the factual predicate of a plaintiff's tort claim against the housing authority, it is somewhat troubling to require litigation to be pursued only in that forum. The history of the St. Regis Mohawk Tribal Court is complicating in an additional way. Since it appears that -- whatever its status now -- the Tribal Court was not created until 1996 or 1997, it is a little awkward to read the "sue and be sued" ordinance (passed by the Tribal Council in 1984) as a waiver of sovereign immunity only in (apparently yet-to-be-envisioned-or-created) Tribal Courts. Although I ultimately agree with the majority that the 1984 ordinance effected a waiver for suit only before the Tribal Council, this explanation is not entirely satisfactory. Manifestly, the HUD-mandated regulations for setting up a tribal housing authority and the St. Regis Mohawk ordinance based explicitly upon those regulations were intended to institute a legally responsible corporate entity to facilitate business dealings on and off reservation. "Consent to limited suit against a reservation-created housing authority may be inherent in th[is] federal program, in light of the fact that developers and lenders will be reluctant to deal with a corporation which is legally irresponsible and cannot be made to answer for its debts." Namekagon Development Co., Inc. v. Bois Forte Reservation Housing Auth., 395 F. Supp. 23, 29 (D. Minn. 1974), aff'd, 517 F.2d 508 (8th Cir. 1975). If this is so, one could argue that the waiver was intended to be broader and more protective of non-tribal persons and businesses, encompassing suits in federal court. However, the parties have not pursued this issue in their briefs and have not provided us with any materials which might illuminate the intent of Congress, HUD or the tribe. In the absence of such illumination, and because the court's interpretation of the tribal ordinance should in the future be fair and workable, I join the court's opinion.