FILED
United States Court of Appeals
Tenth Circuit

March 18, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

ANGELITA M. CHEGUP; TARA J.
AMBOH; MARY CAROL JENKINS;
LYNDA M. KOZLOWICZ,

     Plaintiffs - Appellants,

v.

UTE INDIAN TRIBE OF THE UINTAH
AND OURAY RESERVATION, a
federally recognized Indian tribe; THE
TRIBAL BUSINESS COMMITTEE FOR
THE UTE INDIAN TRIBE OF THE
UINTAH AND OURAY RESERVATION;
LUKE DUNCAN; TONY SMALL;
SHAUN CHAPOOSE; EDRED
SECAKUKU; RONALD WOPSOCK;
AND SAL WOPSOCK,

     Defendants - Appellees.

Nos. 19-4178 & 20-4015

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:19-CV-00286-DAK-PMW)**
_____

Ryan Dreveskracht, Galanda Broadman PLLC, Seattle, Washington (Anthony S.
Broadman, Galanda Broadman PLLC, Seattle, Washington, with him on the briefs), for
Appellants.

J. Preston Stieff, J. Preston Stieff Law Offices, LLC, Salt Lake City, Utah, for Appellees.
_____

Before **HARTZ**, Circuit Judge, **LUCERO**, Senior Circuit Judge, and **EID**, Circuit Judge.

1

_____

**EID**, Circuit Judge.

_____

The Ute Indian Tribe of the Uintah and Ouray Reservation ("the Tribe") temporarily banished Angelita M. Chegup, Tara J. Amboh, Mary Carol Jenkins, and Lynda M. Kozlowicz ("the banished members"). The banished members did not challenge their temporary banishment in a tribal forum, but instead sought relief in federal court by filing a petition for habeas corpus. The banished members contended that, because they were excluded from the reservation by virtue of their banishment, they were "detained" within the meaning of the Indian Civil Rights Act of 1968 ("ICRA"). The district court disagreed and dismissed the suit without considering the Tribe's alternative position: that the court could not consider the claims at all because the banished members failed to exhaust their tribal remedies. On appeal, we do not consider the substantive question whether tribal banishment is detention for purposes of habeas. Indeed, we think the district court should not have considered that question either. Respect for tribal sovereignty required that, before the court below decided this complex and difficult question about the scope of ICRA habeas, the banished members must have either exhausted their tribal remedies or met the heavy burden of demonstrating why they had not. Even though tribal exhaustion is non-jurisdictional, and courts may often choose between threshold grounds for denying relief, we think that under the unique circumstances of this case there was a right choice. Because the district court neither began its analysis with tribal exhaustion nor reached that issue in the alternative, we

2

remand for it to be decided in the first instance.  We also reverse the district court's

denial of the banished members' motion for costs.

## I.

### a.

In 2018, the Ute Indian Tribe of the Uintah and Ouray Reservation, a federally

recognized Indian tribe, initiated a lawsuit against the United States and certain federal

officials in the United States District Court for the District of Columbia ("DDC").  *See*

*Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, No. 1:18-cv-

00546-CJN (D.D.C. filed Mar. 8, 2018).[1]  According to the banished members, the Tribe

"alleged in part[] that the United States violated (and continues to violate) federal law by

treating Uncompahgre Reservation lands as though they are owned by the United States

outright, rather than in trust for the Tribe."  App'x Vol. I at 20.[2]  Further, the Tribe

maintained that, as a result of that violation, "the United States has been wrongfully

appropriating revenue relating to the sale or leasing of lands within the Reservation"—

---

[1] The facts discussed in this opinion come from the banished members' petition and its attachments, as well as from two declarations submitted in the district court that are relevant to the tribal exhaustion question.  We also take judicial notice of the DDC proceedings.  *See Barnes v. United States*, 776 F.3d 1134, 1137 n.1 (10th Cir. 2015) (taking judicial notice of records from a party's "earlier criminal and civil cases"); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

[2] According to the complaint the Tribe filed in the DDC, the Tribe's current reservation—the Uintah and Ouray Reservation—was "created by the joinder of two initially separate contiguous reservations which had been created for the Bands of the Tribe: the Uintah Valley Reservation and the Uncompahgre Reservation."  Compl. ¶ 3, *Ute Indian Tribe*, No. 1:18-cv-00546-CJN (Mar. 8, 2018), ECF No. 1.

revenue "claimed to be in the hundreds of millions of dollars." *Id.* As relief for these allegedly wrongful actions, the Tribe sought, among other things: "(1) an injunction prohibiting the United States from treating lands within the Reservation as though they are owned by the United States outright; [and] (2) an order quieting title in the name of the United States in trust for the Tribe." *Id.*

Three of the banished members—individual Indians who are members of the Ute Indian Tribe—sought to intervene in the Tribe's suit, proceeding pro se. Jenkins and Amboh, along with two others not party to this suit, filed a motion in which they purported to represent the "Uinta Utah Band, Utah." Uinta Indians Mot. to Intervene at 1, *Ute Indian Tribe*, No. 1:18-cv-00546-CJN (Mar. 22, 2018), ECF No. 11. Jenkins and Amboh appear to have asserted before the DDC that (1) the "Uinta Indians" is an existing tribe that is distinct from the Ute Indian Tribe and (2) the "Uinta Indians"—*not* the Ute Indian Tribe—is the entity that can lay proper claim to the "sovereign interest and ownership to the . . . lands at issue in [the] Ute Indian Tribe's [DDC] complaint." *Id.* at 2; *see also* Intervenor Uinta Valley Reply at 2–3, *Ute Indian Tribe*, No. 1:18-cv-00546-CJN (Apr. 20, 2018), ECF No. 15.

A little over a week later, Kozlowicz—joined by three additional people not parties to this suit—filed a pro se motion to intervene in which she purported to represent the "Tabequache/Uncompahgre Indians." Tabequache/Uncompahgre Mot. to Intervene at 1, *Ute Indian Tribe*, No. 1:18-cv-00546-CJN (Apr. 2, 2018), ECF No. 12. It seems the "Tabequache/Uncompahgre" intervenors maintained, similar to the previous motion, that (1) the "Tabequache/Uncompahgre Indians" is an existing tribe that is distinct from the

4

Ute Indian Tribe and (2) the Ute Indian Tribe's suit is "interfer[ing] with" the Tabequache/Uncompahgre Indians' "protected federal sovereign rights" under the "Tabequache 1863-1868 Treaty." Tabequache Grp. Reply on Mot. to Intervene & Mot. for Prelim. Inj. at 3, *Ute Indian Tribe*, No. 1:18-cv-00546-CJN (Apr. 23, 2018), ECF No. 16. While their motion to intervene was pending, the Tabequache/Uncompahgre intervenors sought a preliminary injunction against the Ute Indian Tribe.[3]

The Ute Indian Tribe opposed the motions to intervene and the motion for a preliminary injunction. Ultimately, the tribe prevailed against the putative intervenors. The district court denied all three motions because it determined that "federal courts have refused to allow non-attorneys to represent Indian tribes that are not federally recognized." Order at 1–2, *Ute Indian Tribe*, No. 1:18-cv-00546-CJN (Aug. 22, 2018), ECF No. 24; *see also* Order at 2, *Ute Indian Tribe*, No. 1:18-cv-00546-CJN (Aug. 24, 2018), ECF No. 26.

---

[3] By 1950, the separate federally recognized Uncompahgre and Uintah bands united and ceased to exist. As we have explained, "[p]ursuant to the [Indian Reorganization Act of 1934], the Uintah, White River, and Uncompahgre bands formed the Ute Indian Tribe of the Uintah and Ouray Reservation in 1937," and, "in June 1950, representatives of the members of the Uncompahgre, White River, and Uintah Bands signed a series of five tribal resolutions which completed the transition . . . from loosely-knit bands to unified Ute Tribe." *Hackford v. Babbitt*, 14 F.3d 1457, 1461 (10th Cir. 1994).

In certain circumstances an Indian group that is not a federally recognized tribe can assert a claim alleging violation of an Indian treaty notwithstanding the group's lack of federal recognition. *See, e.g.*, *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1203–04 (10th Cir. 2002); *see also Yellen v. Confederated Tribes of the Chehalis Rsrv.*, 141 S. Ct. 2434, 2458 (2021) (Gorsuch, J., dissenting) (noting that some "[Indian] groups may have federal rights secured by treaty, which may exist even if the tribe is no longer recognized"). We express no opinion regarding the merits of the claims that were presented to the DDC.

**b.**

The DDC litigation was not the first time that the banished members had attempted to intervene in litigation involving the Tribe.[4] It proved, though, to be the last the Tribe would tolerate. On October 30, 2018, the Tribal Business Committee for the Ute Indian Tribe ("Business Committee")—a board that serves as "a governmental body of the Tribe"—"received a complaint from 70 members of the Ute Indian Tribe . . . requesting the banishment of [the banished members], based on alleged engagement in acts which seriously threaten[ed] the peace, health, safety, morals and general welfare of the [Tribe]." App'x Vol. I at 19, 21 (omission in original).[5] Specifically, the complaint alleged that the banished members: (1) "[r]epeatedly interfered in ongoing litigation involving the Tribe"; (2) "[c]ause[d] repeated delays and confusion in cases which impact the future well-being of the Tribe and its membership"; (3) "engaged in vexatio[us] litigation in federal, state, and tribal courts" "[f]or nearly thirty years" by submitting "frivolous and often nonsensical" court filings that caused "confus[ion]" as to who "represent[ed] the views and opinions of the tribe"; (4) "delay[ed] legal proceedings, confus[ed] legal issues, and interven[ed] where [the banished members] shouldn't, . . . cost[ing] the Tribe millions of dollars in unnecessary legal fees"; and (5) sought "to

---

[4] Chegup does not seem to be among those who attempted to intervene in the DDC proceeding, but apparently she was involved in other cases in which the Tribe was a party.

[5] The banished members have not obtained a copy of this complaint, so their petition relies on the references to it found within the tribal resolution that initiated banishment proceedings against them.

6

destabilize the tribal government, causing waste in resources, delay in providing services, and diminishe[d] . . . respect [for] the Tribe as a sovereign entity." *Id.* at 31.

In response to the complaint, the Business Committee, on November 19, 2018, issued Resolution No. 18-472, which initiated banishment proceedings against the banished members. The resolution authorized serving a complaint and notice of hearing on the banished members. The resolution also scheduled a banishment hearing for November 27, 2018, at 1:30pm.

On November 20, 2018, the Business Committee issued the notice of hearing. Like the tribal resolution, the notice of hearing established that the banished members' banishment hearing would be held on November 27, 2018, at 1:30pm. It also informed the banished members that at the hearing the Business Committee would "decide whether to banish [them] from the Uintah and Ouray Reservation for [their] actions which seriously threaten[ed] the peace, health, safety, morals, and general welfare of the Ute Indian Tribe." *Id.* at 34. Finally, the notice of hearing listed the allegations found in the complaint, and it told the banished members that they could "appear with counsel if [they] desire[d] and present evidence on [their] own behalf." *Id.*

Chegup, Jenkins, and Kozlowicz were served the notice of hearing on November 23, 2018. The record is less clear as to when the notice of hearing was served on Amboh. Sometime after the banishment hearing was scheduled but before it took place, Amboh, according to a declaration she filed in the district court, "attempted to file document requests with the Tribal Court clerk, seeking any evidence to be used against [her], as well as any Complaint, Resolution, Policy, Guideline, or Ordinance to be implemented at

7

[her] Banishment Hearing." App'x Vol. II at 193.[6] Amboh, though, was not successful.

Instead, Amboh says, "[t]he Tribal Court clerk served [her] in the lobby with the Notice

of Banishment Hearing, refused to acknowledge any document request, and refused to

otherwise provide [her] with any written tribal law or regulation." *Id.* Later, Amboh

"went to the tribal offices . . . and asked the secretary for any evidence to be used against

[her], as well as any Complaint, Resolution, Policy, Guideline, or Ordinance to be

implemented at the Hearing." *Id.*[7] Amboh alleges that "[t]he secretary responded that

she 'didn't know where the complaint was' and that [the banished members] '[we]re not

entitled to any private Business Counsel [sic] records.'" *Id.*

On November 27, 2018—the day of the hearing—the banished members obtained

counsel to represent them in the banishment proceeding. Their counsel, however, was

not available to appear at the hearing in person. The banished members asked the

Business Committee to permit their attorney to appear telephonically, but the Business

---

[6] The banished members' petition and Amboh's declaration allege that Amboh attempted to file these document requests on November 16, 2018. That date, however, makes little sense. Amboh could not have requested documents related to her upcoming hearing until after the Business Committee decided to hold the hearing. As recounted above, the Business Committee did not decide to hold the hearing until November 19, 2018.

[7] The date of this encounter also cannot be pinned down with certainty. Amboh does not state in her declaration the date of her encounter with the secretary at the tribal offices, noting only that it was around "1:00." App'x Vol. II at 193. The next paragraph of her declaration, however, discusses the November 27, 2018, hearing, in similar language. "When I was finally called before the Business Committee for my Banishment Hearing it was roughly 3:00 p.m." *Id.* Because these events appear consecutively in the declaration and only use time signals, and because the meeting with the secretary occurred shortly before the scheduled hearing time, it seems plausible that both occurred on November 27, 2018.

Committee declined the request.  It reasoned that applicable tribal guidelines "d[id] not provide for telephonic participation at the hearing," and that the banished members had been "given reasonable time to provide for an attorney's attendance."  App'x Vol. I at 23.

Dissatisfied that their attorney could not participate, the banished members opted not to attend the hearing, which went forward without them.  At the hearing, the Business Committee claims to have "heard the testimony of Ms. Cesspooch," who "read the complaint and played an audio recording of a court proceeding in the United States District Court for the District of Utah . . . in which one or more of the [banished members] . . . engaged in the acts described in the complaint."  *Id.*[8]  "Ms. Cesspooch also presented as an exhibit a copy of a summary of attorney fees incurred by the Tribe in defending court actions brought by one or more of [the banished members]."  *Id.*

At the end of the hearing, the Business Committee decided to take action against the banished members.  Applying the Tribe's *Guidelines for Business Committee Hearings on Exclusion and Removal Under the Exclusion and Removal Code*—which the Business Committee determined "guarantee[d] [the banished members] all due process and other rights guaranteed under the Ute Tribe Constitution"—the Business Committee found "by clear and convincing evidence that [the banished members] ha[d] engaged in acts which seriously threaten the peace, health, safety, morals and general welfare of the

---

[8] These facts concerning what occurred at the banishment hearing are drawn from the banished members' petition.  Because the banished members did not attend the hearing, they rely on the Business Committee's account of what happened.

Tribe." *Id.* at 24. The Business Committee sanctioned them, issuing the Ute Tribal Business Committee Order of Banishment ("Banishment Order").

The Banishment Order provided that the banished members were "temporarily excluded, banished, and . . . subject to removal from the Uintah and Ouray Reservation for a period of five (5) years." *Id.* But this temporary banishment was (and is) subject to exceptions. Notwithstanding their banishment, the banished members are permitted to enter the reservation for five purposes: "(1) for access to their respective allotted lands, if any; (2) to meet with the Bureau of Indian Affairs concerning their allotted lands, if any; (3) to attend to tribal business at tribal offices; (4) to attend the annual tribal membership meeting . . . ; and (5) to receive health care at the [Indian Health Service] Uintah & Ouray Service Unit." *Id.* at 24–25. "Except in case of a medical emergency," before entering the reservation for these purposes the banished members are required to "give the Business Committee at least 14 days' written notice of [their] intent to visit the Reservation, stating the date, time, purpose, and approximate duration of the intended visit," and they cannot enter unless the Business Committee approves the visit. *Id.* at 25. While on the reservation during an approved visit, they must be escorted by "[a] tribal law enforcement or security officer." *Id.*

The Business Committee also issued three other sanctions. First, it fined the banished members $242,982.93, an amount equal to the financial losses that the Business Committee found the Tribe had incurred due to their actions. Second, it garnished 100% of the banished members' tribal dividends and bonuses until their fine is paid in full. Third, it terminated the banished members' "rights . . . to tribal employment, Housing

Authority units, or Housing Department units"; revoked any land assignments that had been previously granted to them; and barred them "from obtaining tribal employment, tribal housing of any type, or land assignments" for five years. *Id.* at 24.

The record suggests that, after the Business Committee temporarily banished the banished members from the Tribe's reservation, they made one attempt to challenge the Banishment Order via a tribal process. According to Amboh's declaration and a declaration submitted by Kozlowicz, "[s]hortly after the Banishment Hearing, [Amboh and Kozlowicz] attempted to go to the Tribal Court and see if there was anything [they] could do to get relief from the Business Committee's Banishment Order." *Id.* at 189; App'x Vol. II at 193.[9] Amboh and Kozlowicz allege that they "w[ere] told by the Tribal Court clerk that the Order was final and nonappealable and that there was nothing that could be done in Tribal Court." App'x Vol. I at 189; App'x Vol. II at 193.

**c.**

On April 29, 2019, the banished members brought this case in the United States District Court for the District of Utah against the Tribe, the Business Committee, and Luke Duncan, Tony Small, Shaun Chapoose, Edred Secakuku, Ronald Wopsock, and Sal Wopsock, the members of the Business Committee.[10] The banished members initiated

---

[9] It is possible that Amboh and Kozlowicz went to the tribal court at separate times. The relevant portions of their declarations are identical. *See* App'x Vol. I at 189; App'x Vol. II at 193. But both simply say they went to the court "[s]hortly after the Banishment Hearing," and neither addresses whether the other was there during the visit. App'x Vol. I at 189; App'x Vol. II at 193.

[10] We refer to the individual defendants as "the Business Committee members." We collectively refer to the Tribe, the Business Committee, and the Business Committee members as "the Tribe."

their suit by filing a document that they styled as a "Civil Rights Complaint" and "Petition for Writ of *Habeas Corpus*." App'x Vol. I at 15 (capitalization altered). In their petition, they claimed that their temporary banishment was issued in violation of their right to due process, their right to be informed of charges, and their right to confront witnesses, as provided by § 1302 of ICRA. They also maintained that their temporary exclusion from the Tribe's reservation was a form of detention, so the district court could hear the dispute pursuant to ICRA's habeas provision, § 1303. *See* 25 U.S.C. § 1303 ("The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe.").

The district court dismissed the case pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Relying on our court's unpublished decision in *Oviatt v. Reynolds*, 733 F. App'x 929 (10th Cir. 2018), the Second Circuit's decision in *Shenandoah v. United States Department of the Interior*, 159 F.3d 708 (2d Cir. 1998), and the Ninth Circuit's decision in *Tavares v. Whitehouse*, 851 F.3d 863 (9th Cir. 2017), the district court concluded that temporary banishment does not constitute detention for purposes of ICRA § 1303, so the court was unable to adjudicate the dispute. As relevant here, the district court noted that dismissal was also required if the banished members had failed to exhaust tribal remedies. But because the district court had already determined that they had "failed to establish that they [we]re 'in custody,'" it chose "not [to] address tribal exhaustion." App'x Vol. II at 352. The banished members appealed.

**II.**

As the district court recognized, this appeal presents a significant question about the scope of the right granted by ICRA. But it also presents a separate tribal exhaustion issue. Both are independent potential grounds for dismissal that implicate different interests. Here, the district court chose the first and did not reach the second. Based on the unique circumstances of this case, however, we conclude that the district court should have begun by addressing tribal exhaustion. Only then, assuming that exhaustion was not an obstacle to this suit, should it have considered whether temporary or permanent banishment is cognizable as detention under ICRA's habeas provision. Finding error in its decision to do otherwise, we reverse with instructions to resolve the exhaustion issue before turning to the substance of the claim or dismissing the action. In doing so, we express no opinion on the banishment question beyond noting its importance, complexity, and difficulty.[11] Indeed, those very aspects of the issue underscore our conviction that the district court should not have proceeded to decide it before first confronting whether a federal court was properly hearing this case. Out of respect for comity and the tribal sovereignty interests that undergird ICRA, we conclude that the district court should have started its analysis at exhaustion.

---

[11] For example, some of the issues implicated by the question—such as whether "in custody" and "detention" are truly synonymous in the ICRA habeas context—may require revisiting prior decisions. *See Dry v. CFR Court of Indian Offenses for the Choctaw Nation*, 168 F.3d 1207, 1208 n.1 (10th Cir. 1999) ("We read the 'detention' language as being analogous to the 'in custody' requirement."); *see also Valenzuela v. Silversmith*, 699 F.3d 1199, 1203 (10th Cir. 2012).

**a.**

We do not address the district court's substantive decision that temporary banishment does not qualify as detention for purposes of ICRA. Rather, we are concerned with its procedural decision to confront that question before first considering whether the banished members had exhausted their tribal remedies. To be sure, both are imperative. "All federal courts addressing the issue mandate that two prerequisites be satisfied before they will hear a habeas petition filed under ICRA: [t]he petitioner must be in custody, and the petitioner must first exhaust tribal remedies." Cohen's Handbook of Federal Indian Law § 9.09 (2017); *accord Jeffredo v. Macarro*, 599 F.3d 913, 918 (9th Cir. 2010). All federal courts also generally have "leeway to choose among threshold grounds for denying audience to a case on the merits." *Valenzuela v. Silversmith*, 699 F.3d 1199, 1205 (10th Cir. 2012). But, under these circumstances, we conclude that any such "leeway" must give way to the important interests of tribal sovereignty. The district court should have chosen to start with exhaustion.

We begin by discussing the tribal exhaustion doctrine involved in this case. "[W]hen a federal court has subject-matter jurisdiction over a claim arising in Indian country over which a tribal forum has colorable jurisdiction, principles of comity and the federal policy of promoting tribal self-government generally require that the plaintiff fully exhaust tribal remedies before proceeding in federal court." Restatement of the Law of Am. Indians § 59 cmt. a (Am. Law Inst., Proposed Final Draft 2021). This tribal exhaustion requirement is "a 'prudential rule,' based on comity." *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997) (citation omitted) (quoting *Iowa Mut. Ins. Co. v.*

14

*LaPlante*, 480 U.S. 9, 20 n.14 (1987)).  It is "grounded in federal policies supporting tribal sovereignty, including: '(1) furthering congressional policy of supporting tribal self-government; (2) promoting the orderly administration of justice by allowing a full record to be developed in the tribal court; and (3) obtaining the benefit of tribal expertise if further review becomes necessary.'"  *Norton v. Ute Indian Tribe of the Uintah and Ouray Rsrv.*, 862 F.3d 1236, 1242–43 (10th Cir. 2017) (quoting *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1507 (10th Cir. 1997)).  "Where [these] comity concerns are present, '[j]urisdiction presumptively lies in the tribal court . . . unless Congress has expressly limited that jurisdiction.'"  *United States v. Tsosie*, 92 F.3d 1037, 1041 (10th Cir. 1996) (second alteration and omission in original) (quoting *Smith v. Moffett*, 947 F.2d 442, 444 (10th Cir. 1991)).  "At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts."  *Iowa Mut.*, 480 U.S. at 17.

The tribal exhaustion rule applies broadly, generally covering any case in which "[t]he activity at issue arises on the reservation."  *Texaco, Inc. v. Zah*, 5 F.3d 1374, 1378 (10th Cir. 1993).  We typically employ the rule in cases where a parallel tribal court suit has already been initiated.  *See, e.g.*, *Norton*, 862 F.3d at 1240–42; *Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1229, 1237 (10th Cir. 2014).  But "its application does not depend upon the existence of a pending action in the tribal forum."  *Texaco*, 5 F.3d at 1376.  Additionally, the rule applies "[r]egardless of the basis for [federal] jurisdiction."  *Valenzuela*, 699 F.3d at 1206 (alterations in original) (quoting *Iowa Mut.*, 480 U.S. at 16).  Accordingly, we apply "the tribal exhaustion rule to § 1303 petitions," even though,

"[u]nlike other federal habeas corpus statutes, § 1303 does not state that petitioners must exhaust their claims before litigating them in federal court." *Id.* at 1205–06.

"As a prudential rule based on comity, the exhaustion rule is not without exception." *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1150 (10th Cir. 2011). We have recognized that exhaustion of tribal remedies is unnecessary "(1) where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) where the tribal court action is patently violative of express jurisdictional prohibitions; (3) where exhaustion would be futile because of the lack of an adequate opportunity to challenge the tribal court's jurisdiction; (4) when it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by the main rule established in *Montana v. United States*, 450 U.S. 544 (1981); or (5) it is otherwise clear that the tribal court lacks jurisdiction so that the exhaustion requirement would serve no purpose other than delay." *Norton*, 862 F.3d at 1243 (alteration omitted) (quoting *Burrell v. Armijo*, 456 F.3d 1159, 1168 (10th Cir. 2006)). While these exceptions are meaningful, they "are applied narrowly." *Id.* (quoting *Thlopthlocco*, 762 F.3d at 1239). "[O]ur court 'has taken a strict view of the tribal exhaustion rule.'" *Id.* (quoting *Kerr-McGee*, 115 F.3d at 1507). "We have required a party invoking any of these exceptions to 'make a substantial showing of eligibility.'" *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 11 F.4th 1140, 1149 (10th Cir. 2021) (quoting *Thlopthlocco*, 762 F.3d at 1238); *see also Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 34 (1st Cir. 2000) ("Although claims of futility, bias, bad faith, and the like roll easily off the tongue, they are difficult to sustain.").

16

On appeal, the Tribe argues that the banished members' failure to exhaust tribal remedies is an alternative reason to affirm the judgment below. Tribal law, at least in 2014, granted the tribal court "exclusive authority to hear appeals from orders of exclusion and/or removal after a hearing has been held thereon before the Ute Tribal Business Committee." App'x Vol. I at 112 (quoting Ute Indian Exclusion & Removal Code § 3-1-11(1) (2014)). The tribal appellate court had "exclusive authority to hear appeals from orders of exclusion and/or removal," including authority to issue stays. *Id.* (quoting Ute Indian Exclusion & Removal Code § 3-1-11(2)–(3) (2014)). The banished members do not dispute that they failed to bring an action in tribal court but offer two responses. As a general matter, they contend that affirming on grounds not considered below is not favored. Alternatively, the banished members invoke the bad-faith and futility exceptions to the tribal exhaustion rule, making several arguments that exhaustion was excused.[12] We leave these arguments to the district court because our holding is limited to charting the path that should be followed upon remand.

---

[12] First, the banished members say that "Kozlowicz ha[s] been barred from stepping foot in the Tribal Court—in 2016 she was arrested for just inquiring about a case." Reply Br. at 8. Second, they maintain that "Ordinance No. 13-022 explicitly forbade the bringing of any suit against the Tribe, and it had been applied to some of the [banished members] as recent [sic] as the summer of 2016." *Id.* at 9 (footnote omitted). Third, they assert that "[a]ttempts to obtain any applicable law, resolution, policy, guideline, or ordinance were . . . denied by the Tribal Court and the Tribe's administrative offices." *Id.* Fourth and finally, they allege that "[a]ttempts to appeal the Banishment Order were met with [the Tribe] telling [the banished members] that the Order was final and non-appealable and that there was nothing that could be done in Tribal Court." *Id.* at 8–9 (internal quotation marks omitted).

**b.**

We have recognized that "[f]ederal courts may choose to avoid difficult subject matter jurisdiction questions and dispose of a case on a 'threshold, nonmerits issue,' . . . so long as resolving the issue 'does not entail any assumption by the court of substantive law-declaring power.'" *Valenzuela*, 699 F.3d at 1205 (quoting *Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 433 (2007)) (affirming dismissal because of failure to exhaust tribal remedies without determining whether claim could proceed under § 1303). Here, the district court chose the opposite course. It began with the difficult jurisdiction-related question about the scope of detention under ICRA and, after determining that temporary banishment was not cognizable in ICRA habeas, declined to reach or resolve the exhaustion issue. While this is ordinarily a proper path within the district court's discretion, we conclude for several reasons that the district court made the wrong choice in this particular case by not prioritizing the issue of exhaustion. First, the question whether temporary banishment qualifies as detention requires deciding a significant and contentious issue about the scope of the right to habeas corpus under ICRA. Second, tribal exhaustion is an obvious and compelling potential obstacle in this case. Third, the comity and sovereignty concerns that motivate tribal exhaustion doctrine are at their zenith when a federal court stands in direct supervision of a tribe's sovereign actions.

**i.**

The first factor that informs our decision is the complexity and difficulty of the question the district court *did* decide. Whether banishment constitutes detention for

purposes of § 1303 is a significant question that implicates several additional issues and has divided two of our sister circuits.[13]

"Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.'" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991)). "As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978). Congress, however, "has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." *Id.*

In 1968, Congress opted to "exercise . . . that authority" by enacting ICRA. *Id.* at 57. ICRA provides that the "privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe." 25 U.S.C. § 1303. The product of extensive hearings "into the matter of the civil rights of persons under the authority of Indian tribes," the statute marked a significant departure from the status quo that existed prior to its enactment. Cohen's Handbook of Federal Indian Law § 14.04[2]. Whereas before ICRA federal constitutional restraints did not apply to tribes and "few tribal constitutions included

---

[13] Although we have described the detention question as jurisdictional in an unpublished opinion, *see Oviatt*, 733 F. App'x at 931–33, the matter of ICRA's scope is much more bound up with the merits of the banished members' claims than, for example, ordinary issues of subject matter jurisdiction might be. This informs our decision that tribal exhaustion should have come first in this case.

[individual rights] provisions" comparable to those in the United States Constitution, after ICRA tribal governments became subject—via § 1302—to "restrictions . . . similar . . . to those contained in the Bill of Rights and the Fourteenth Amendment." *Santa Clara Pueblo*, 436 U.S. at 57, 65 n.20. At the same time that Congress sought to increase Indians' individual rights, however, it also "desire[d] not to intrude needlessly on tribal self-government." *Id.* at 71. Congress thus struck in ICRA a careful balance between "strengthening the position of individual tribal members vis-à-vis the tribe" and "promot[ing] the well-established federal 'policy of furthering Indian self-government.'" *Id.* at 62 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). For instance, "rather than providing in wholesale fashion for the extension of constitutional requirements to tribal governments, . . . [Congress] selectively incorporated and in some instances modified the safeguards of the Bill of Rights to fit the unique political, cultural, and economic needs of tribal governments." *Id.* Additionally, Congress "expressly supplied" "only [one] remedial provision" in ICRA: § 1303, which makes available "the 'privilege of the writ of habeas corpus . . . to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe.'" *Id.* at 58 (quoting 25 U.S.C. § 1303).

After ICRA's enactment, some maintained that, in addition to expressly allowing federal-court review of tribal proceedings via the writ of habeas corpus, ICRA implicitly authorized causes of action for declaratory and injunctive relief against tribes or their officers in federal court. In *Santa Clara Pueblo v. Martinez*, however, the Supreme Court rejected this view. The Court acknowledged that "Congress clearly has power to

20

authorize civil actions against tribal officers, and has done so with respect to habeas corpus relief in § 1303." *Id.* at 60. But it also recognized that "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that [courts] tread lightly in the absence of clear indications of legislative intent." *Id.* Such caution is especially called for when interpreting ICRA, the Court further reasoned, because Congress sought "to promote dual objectives in a single statute"—extending rights to individual Indians *and* furthering tribal self-determination. *Id.* at 64. Accordingly, the Court determined that "Congress' failure to provide remedies other than habeas corpus was a deliberate one." *Id.* at 61. Therefore, "ICRA . . . authorize[s] federal judicial review of tribal actions only through the habeas corpus provisions of § 1303." *Id.* at 70.

Post–*Santa Clara Pueblo*, federal review has been limited to habeas, leaving tribal courts to adjudicate any other civil rights claims. *See* Restatement of the Law of Am. Indians § 16 cmt. a ("With the exception of actions for habeas corpus relief [under § 1303, ICRA's civil rights] guarantees are enforceable exclusively in tribal courts and other tribal fora."). Yet notwithstanding the general limitation on federal review of ICRA claims, those aggrieved by tribal action—but not incarcerated—have sometimes sought to circumvent tribal court review by characterizing their harms as forms of detention that fall within § 1303's ambit. Federal courts have generally batted away such attempts. *See, e.g.*, *Jeffredo*, 599 F.3d at 918–21; *Walton v. Tesuque Pueblo*, 443 F.3d 1274, 1279 (10th Cir. 2006). But they have struggled with whether the type of sanction at issue here,

21

temporary or permanent banishment from an Indian reservation, satisfies § 1303's detention requirement.

The Second Circuit, in *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874 (2d Cir. 1996), was the first federal court of appeals to grapple with this question. There, members of the Tonawanda Band of Seneca Indians ("Tonawanda Band") claimed that "certain tribal officials summarily convicted them of 'treason' and sentenced them to permanent 'banishment' from the Tonawanda Seneca Indian Reservation." *Id.* at 876. Seeking federal review pursuant to § 1303, the Tonawanda Band members argued that "the threat of permanent banishment was . . . a sufficient restraint on liberty to trigger the application of the ICRA's habeas corpus provision." *Id.* The Second Circuit agreed.

In reaching its conclusion, the Second Circuit assessed whether "the 'custody' requirement as developed under other habeas statutes" should inform the application of § 1303, and it answered in the affirmative. *Id.* at 889. It noted that § 1303's trigger, detention, is different from that found in other federal habeas statutes which permit review when a person is "in custody." *Poodry*, 85 F.3d at 890 (citing 28 U.S.C. §§ 2241(c)(3), 2254(a), 2255). But it opined that "the choice of language [was] unremarkable." *Id.* Pointing to "the federal statute authorizing a motion attacking a federal sentence as well as . . . the procedural provisions accompanying § 2241," it concluded that "Congress appears to use the terms 'detention' and 'custody' interchangeably in the habeas context." *Id.* at 890–91 (citation omitted). Therefore, the Second Circuit decided that a federal court must ascertain whether a petitioner is "detained" for purposes of § 1303 by using the traditional habeas test, which permits

22

habeas review when a petitioner is subject to "severe restraints on individual liberty." *Id.* at 894 (quoting *Hensley v. Mun. Ct.*, 411 U.S. 345, 351 (1973)).

Applying that test, the Second Circuit deemed permanent banishment to be detention. It observed that "[a]s long as the banishment order st[ood], the petitioners [could] be removed from the Tonawanda Reservation at any time." *Id.* at 895. Indeed, "the banishment orders ma[d]e clear that at some point [the petitioners could] be compelled to 'go,' and no longer welcome to 'come.'" *Id.* "That," the court concluded, "[was] a severe restraint to which the members of the Tonawanda Band [we]re not generally subject," and thus the habeas-review test was satisfied. *Id.*

The Second Circuit's decision in *Poodry* was not unanimous. Judge Jacobs dissented. He agreed with the majority that the Tonawanda Band members needed to "show a severe actual or potential restraint on liberty" to obtain habeas review pursuant to § 1303. *Id.* at 901 (Jacobs, J., dissenting). He contended, though, that the Tonawanda Band members had not done so. True, he said, "no one can discount the drastic impacts (cultural, economic, and social) that banishment and exclusion would have on one who has been a member of the Tonawanda Band." *Id.* at 902. But "[o]nce they exit the reservation, petitioners will be free to settle and travel where they wish, and to come and go as they please, in the same way and to the same extent as any other person in the United States." *Id.* In other words, Judge Jacobs explained, "[i]n terms of . . . habeas corpus jurisdiction, banishment *to the United States* is a meaningless concept." *Id.* at 903. For that reason, the Tonawanda Band members had not, in his view, satisfied the requirements for federal habeas review.

23

Two years after *Poodry* was decided, the Second Circuit, in *Shenandoah*, limited

*Poodry* to cases involving *permanent* banishment. *Shenandoah* concerned a suit by six

former members of the Oneida Indian Nation ("Oneida Nation" or "Nation") who

maintained that, as a result of the actions of the Nation's federally-recognized leadership,

they "were suspended or terminated from employment positions, lost their voices within

the Nation's governing bodies, lost health insurance, were denied admittance into the

Nation's health center, lost quarterly distributions paid to all Nation members, were

banned from various [Nation] businesses and recreational facilities . . . , were stricken

from Nation membership rolls, were prohibited from speaking with a few other Nation

members, and were not sent Nation mailings." 159 F.3d at 714 (brackets and internal

quotation marks omitted). The former members claimed they were subject to severe

restraints on their liberty sufficient to permit habeas review under § 1303. *See id.* at 713–

14.

The Second Circuit disagreed. It said that "[h]abeas relief does address more than

actual physical custody, and includes parole, probation, release on one's own

recognizance pending sentencing or trial, and *permanent* banishment." *Id.* at 714

(emphasis added). But, looking to *Poodry*, it determined that "[t]he punishment that the

petitioners faced in *Poodry* . . . was considerably more severe than the punishments

alleged by [the *Shenandoah*] plaintiffs." *Id.* In particular, the Second Circuit singled out

the "sentence of '*permanent* banishment,'" as having been "sufficiently severe to bring

petitioners within ICRA's habeas provision." *Id.* (emphasis added). The *Shenandoah*

plaintiffs, by contrast, made no similar claim. *See id.* Accordingly, the Second Circuit

concluded that the six former members of the Oneida Nation had not been placed in detention for purposes of § 1303. *See id.*

The Ninth Circuit has also opined on whether and when a person banished from an Indian reservation can seek federal habeas relief. In *Tavares*, it considered a claim "aris[ing] . . . from [the United Auburn Indian Community's] temporary exclusion of" four of its tribal members "from tribal land," namely, from "tribal . . . properties, offices, schools, health and wellness facilities, a park, and the [tribe's] casino." 851 F.3d at 865–66, 868. Like the Second Circuit in *Poodry*, the Ninth Circuit began its analysis by turning to "the words Congress used in § 1303, focusing on [the] difference between the language used in that provision and the language used in the general federal habeas statutes." *Id.* at 871. But unlike the Second Circuit—which found this "choice of language unremarkable," *Poodry*, 85 F.3d at 890—the Ninth Circuit found the difference to be quite significant. It explained that "[w]hen Congress enacted the ICRA in 1968, it was legislating against a well-established habeas framework: the federal courts have habeas jurisdiction whenever a petitioner is 'in custody.'" *Tavares*, 851 F.3d at 871. Yet in § 1303, Congress instead limited habeas review to those in detention, a concept "generally understood to have a meaning distinct from and, indeed, narrower than 'custody.'" *Id.* "Specifically, 'detention' was commonly defined to require physical confinement," whereas "'custody' had a more fluid definition." *Id.* In light of Congress's decision to extend § 1303 only to cases involving "detention," not "custody," and because "even under *Poodry*'s logic, the Second Circuit limited habeas jurisdiction only to permanent banishment orders, not temporary exclusion orders like those" that

25

were at issue, the Ninth Circuit concluded that "the district court [had] lacked jurisdiction under § 1303 of the ICRA to review the challenge to the temporary exclusion orders." *Id.* at 875, 878.

Just as in *Poodry*, the Ninth Circuit's decision in *Tavares* was divided. Judge Wardlaw dissented. Taking issue with the majority's decision to give distinct meanings to the words "detention" and "custody," she found "no indication" in the federal habeas statutes "that the terms might have distinct meanings." *Id.* at 880 (Wardlaw, J., concurring in part and dissenting in part). To the contrary, she said, both words "appear[] frequently throughout" the federal habeas laws, leading her to determine that "as a whole, . . . 'detention' and 'custody' are interchangeable." *Id.* Thus, she viewed the detention requirement as met when a petitioner "is subject to a significant restraint upon his liberty." *Id.* at 883 (quoting *Wilson v. Belleque*, 554 F.3d 816, 822 (9th Cir. 2009)).

Turning to the banishment before the court, Judge Wardlaw found it constituted a "significant restraint" on liberty. She reasoned that "[b]anishment is a uniquely severe punishment" because "[i]t does 'more than merely restrict one's freedom to go or remain where others have the right to be: it often works a destruction of one's social, cultural, and political existence.'" *Id.* at 884 (quoting *Poodry*, 85 F.3d at 897). And, in contrast to both the Ninth Circuit majority and the Second Circuit in *Shenandoah*, Judge Wardlaw maintained that even temporary banishment can constitute detention. "The writ of habeas corpus," she posited, "addresses the *fact* of detention, not its duration." *Id.* at 887. Moreover, she said, "[e]ven if the duration of [the] banishment were relevant . . . , the

26

ten-year term of [the] banishment [at issue] [wa]s sufficient to severely restrain . . . liberty." *Id.* Judge Wardlaw would have permitted the suit to proceed.

We have previously addressed whether tribal exclusion falls within the ambit of § 1303. In *Oviatt*—an unpublished, unanimous decision[14]—we considered whether four "lay advocates in the Ute Tribe" who had been "remov[ed] from [Ute] tribal buildings and [Ute] tribal court" had been "detained." 733 F. App'x at 930–31.[15] In asserting their claim, the lay advocates contended "that they were 'banished,' relying on the Second Circuit's opinion in *Poodry*." *Id.* at 932. We were unpersuaded. We observed that "[w]e have not decided whether banishment satisfies the statutory requirement of detention." *Id.* "But," we continued, "even in the Second Circuit, a tribal member is considered 'detained' only when permanently banished from the tribe." *Id.* (citing *Shenandoah*, 159 F.3d at 714). We hence resolved the lay advocates' claim by assessing whether they had alleged "permanent banishment."

We determined that they had not. The lay advocates had failed to "present[] evidence of a permanent prohibition from entering the Ute Tribe's land." *Id.* Instead, they "appear[ed] to rely on their exclusion from the tribal office, court, and family-services building." *Id.* "[E]xclusion from these facilities," we explained, "does not constitute permanent banishment." *Id.* Thus, we concluded that while the lay advocates

---

[14] Unpublished cases are not binding precedent, but we consider them for their persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

[15] One of those advocates—Kozlowicz—is a party to this suit.

"use[d] the word 'banishment,' they ha[d] not alleged any facts creating a colorable basis for jurisdiction under the Indian Civil Rights Act." *Id.* at 933.

This discussion confirms that the issue the court below chose to resolve is contested, complex, and unanswered in this court. It implicates hard conceptual questions that have fractured our sister circuits, including the relationship between "detention" under ICRA and "custody" under federal habeas law. Another open issue is whether exclusion from one area results in confinement everywhere else, and when, if at all, that condition is cognizable in habeas. A third challenge is determining the difference between temporary and permanent banishment. Of course, by emphasizing the difficulty and importance of the detention issue, we hardly mean to suggest that federal courts should shy away from unresolved legal questions. Instead, we think that when the district court chose to answer *this* legal question before and without considering the exhaustion issues raised by the Tribe, it took insufficient account of this unsettled question's significance. *See Valenzuela*, 699 F.3d 1199 ("avoid[ing] . . . difficult issues [about § 1303's scope] by disposing of" case on tribal exhaustion grounds).

We also emphasize the far greater impact of deciding the scope of detention, as opposed to exhaustion, in this case. Determining whether tribal exhaustion bars this particular action involves finding and applying facts to mostly settled law. A decision in either party's favor would likely have little effect on this circuit. In contrast—and unlike, say, a dismissal for lack of federal jurisdiction because parties are not of completely diverse citizenship—determining that banishment does not constitute detention under ICRA's habeas provision is a far-reaching substantive holding that affects the rights and

28

liabilities of numerous tribes and hundreds of thousands of Indians within our jurisdiction. The same is true of the opposite holding, should we disagree with the district court. What matters is that the question is important however it comes out. But here, comity may well counsel that federal courts should not be deciding it at all. As a result, we think this is the extraordinary case in which an apparent tribal exhaustion problem precludes consideration of a question that has been referred to as jurisdictional.

**ii.**

The second factor informing our decision is that the tribal exhaustion issue was squarely presented and briefed by the parties below as a basis for dismissal. Before the district court, the Tribe argued that the banished members "have not exhausted their tribal remedies." App'x Vol. II at 199. The banished members in turn contended that several recognized exceptions to the exhaustion requirement saved their suit. In short, exhaustion was a ripe, obvious, and procedurally proper way to resolve the case. This rendered the district court's rival course all the more noteworthy in light of the other factors we consider.

Rather than address whether a lack of tribal review barred it from reaching the substance of the banished members' claims about tribal actions, the district court proceeded to decide a major issue about the reach of ICRA habeas. Because of the importance of tribal sovereignty and the strength of the Tribe's exhaustion arguments, the district court should not have lightly prioritized the determination about ICRA's scope. Notwithstanding our agreement with the district court that exhaustion is based on "principles of comity" and is not technically a "jurisdictional prerequisite," that

29

distinction alone does not support a per se rule relegating exhaustion to secondary status. *Id.* at 352; *see also Valenzuela*, 699 F.3d at 1205 ("Federal courts may choose to avoid difficult subject matter jurisdiction questions and dispose of a case on a 'threshold, nonmerits issue,' . . . so long as resolving the issue 'does not entail any assumption by the court of substantive law-declaring power.'") (quoting *Sinochem*, 549 U.S. at 433). If anything, the policy concerns underlying exhaustion suggest the opposite under the unique circumstances of this case, where the detention question is so bound up with the merits and substance of the claims.

It is not the mere presence of the exhaustion doctrine in the briefing that supports reversal, and it would be a very different case if the arguments for tribal exhaustion were baseless. As a result, while it is not appropriate to decide the exhaustion issue in the first instance on appeal, we will very briefly explain why we find the arguments and facts sufficiently compelling to support our decision that exhaustion must be considered before detention in this case. The banished members attack their banishment, so their claims clearly arose on the reservation. *See Texaco*, 5 F.3d at 1378. In that circumstance, the law is clear that tribal exhaustion requires resort to the tribal courts for review. *See Iowa Mut.*, 480 U.S. at 17 ("At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts."). Moreover, tribal law vested the Ute courts with "exclusive authority" to hear appeals from orders of banishment. App'x Vol. I at 112. Here, however, none of the banished members filed an action to review the tribal order of banishment in any tribal forum, let alone did any banished member seek to have an adverse order reviewed

30

in a tribal appellate court.  At first glance, then, it is apparent that tribal remedies were not exhausted, and the federal courts should likely go no further in this case out of respect for tribal sovereignty.

Of course, that framing of the issue skirts the various exceptions to the exhaustion requirement advanced by the banished members.  These exceptions have only been minimally briefed on appeal, not emerging until the banished members' reply, and, like exhaustion itself, should be considered in the first instance by the district court with the benefit of more developed arguments.  That said, our decision that exhaustion must be decided first is partly informed by the weakness of the banished members' cursory arguments for excusing their failure to exhaust, as juxtaposed with the importance of that requirement and the exacting standard courts apply to its exceptions.  The takeaway is that it was not obvious below that exhaustion was excused.  For example, the banished members' contention that they could not challenge their banishment because of a tribal ordinance which prohibited Ute courts from reviewing the Business Committee's actions—and which was apparently applied to some of them as recently as 2016—is not compelling.  *See* Reply Br. at 9–10.  Setting aside the fact that, as the banished members themselves recognize, this provision of tribal law has been "arguably superseded," *id.* at 9 n.12, our precedents are clear that even if the tribal court's doors were closed to the banished members in the past, they were obligated to knock again before bringing the present suit.  *See White v. Pueblo of San Juan*, 728 F.2d 1307, 1313 (10th Cir. 1984) (explaining that "[t]he tribal remedy must be shown to be nonexistent by an actual attempt before a federal court" can hear the case); *Harvey ex rel. Chavez v. Star*, 96 F.3d

31

1453, 1996 WL 511586, at *2 (10th Cir. 1996) (unpublished table decision) ("Pessimism about tribal remedies does not excuse a party from making an attempt to invoke them before turning to federal court.").  Nor do we find the banished members' other charges of futility and bad faith persuasive enough to have supported the district court's decision to ignore exhaustion.[16]  At bottom, the banished members do not appear to have made a "substantial showing" that exhaustion should be excused.  *Thlopthlocco*, 762 F.3d at 1238.  Far from it, this case seems to substantiate the First Circuit's observation that while "claims of futility, bias, bad faith, and the like roll easily off the tongue, they are difficult to sustain."  *Ninigret Dev. Corp.*, 207 F.3d at 34.  While these exceptions are for the district court to sort out, and factual disputes may arise, we find the lack of compelling grounds for excusing the exhaustion requirement to be yet another reason that the court below should have started with exhaustion.  Exhaustion was not plainly or obviously excused here.

_____

[16] The dissent foresees "undue process" and "unjustified delay" as the result of our holding that the district court should have started with exhaustion, partly because "the district court could well conclude on remand that the futility exception to the exhaustion doctrine applies."  Dissent at 2.  The dissent points out that the banished members were told by a tribal court clerk that their banishment was final and not appealable in tribal court.  *Id.*  But we find this theory of futility unpersuasive at this stage.  The banished members have supplied no basis for concluding that the tribal court clerk was authorized to "say what the law is."  State and federal court clerks are usually not tasked with that function, and the banished members provide no basis for a finding that the Tribe's court operates differently.  And while it would be another matter if a tribal court clerk refused to allow a party to file paperwork to initiate a case, *see Finetti v. Harris*, 609 F.2d 594, 598 (2d Cir. 1979) (deeming state remedies exhausted when state court clerk rejected petitioner's state habeas petition and no appeal of the clerk's decision was available), the banished members make no such allegation here.  Absent such circumstances, they were required to try to file a suit in the tribal court, notwithstanding the tribal court clerk's views on the matter, and let a tribal judge decide whether their case could proceed.

32

On the Tribe's facial showing of the banished members' failure to exhaust tribal remedies to this degree, combined with the absence of a strong case that an exception applies and the other factors we discuss, we think this is the rare case in which a district court may not pass over the exhaustion issue in favor of other matters, even when they lead to dismissal. We recognize that a district court generally has discretion to choose among multiple threshold grounds for dismissing a case. *See Valenzuela*, 699 F.3d at 1205. But not all grounds for dismissal are created equal, and some matters are properly resolved before others. Our prior discussion of the bases for tribal exhaustion and the interests that it serves illustrates the comparative importance of that doctrine and underscores why the district court should have started with it in a case that so clearly presented the issue, as well as the other features we discuss. It would be a very different situation if tribal exhaustion did not resound in the record as a reason for dismissal, as it does here, or if the exhaustion arguments first arose on appeal. *See Ninigret Dev. Corp*, 207 F.3d at 31 ("One possible objection to [tribal exhaustion's] application in this situation is that neither the parties nor the district court paid much attention to it.").

**iii.**

The final reason that the district court should have addressed exhaustion before detention is that the comity concerns underlying tribal exhaustion doctrine are at their strongest in a case like this. Here, after all, a federal court has been asked to override the Tribe's sovereign decision to issue the Banishment Order before any tribal court can weigh in on the matter in any capacity. Upon confronting a difficult question about the scope of Indians' right to habeas corpus and a compelling contention that the claim is

33

foreclosed by a failure to exhaust tribal remedies, we think there is little support for choosing to start with the former question. Where ICRA places a federal court in direct supervisory oversight of a tribe, the goals of comity and sovereignty that we have discussed require this result. *See id.* at 33 (noting that "tribal sovereignty . . . forms the epicenter of the tribal exhaustion doctrine").

By choosing to begin with the detention question, the district court transformed litigation that is fundamentally concerned with tribal matters—the banishment of the banished members—into an extended federal meditation on the scope of ICRA's habeas provision. Tribal exhaustion doctrine exists to preserve tribal sovereignty and prevent the federal courts from running roughshod over tribal legal systems. *See Norton*, 862 F.3d at 1243; Restatement of the Law of Am. Indians § 28 cmt. a ("[A]djudication of matters impairing reservation affairs by any nontribal court . . . infringes upon tribal law-making authority, because tribal courts are best qualified to interpret and apply tribal law."). The district court should have begun with exhaustion. Whichever way the exhaustion issue would have played out below, we are confident the sovereign interests of the tribe and critical concerns of comity that undergird this area of law would be properly respected.

\* \* \*

For these reasons, we think it was improper in this case to consider whether banishment constituted detention before first addressing whether tribal exhaustion effectively mooted that question. It is well within our authority to "reverse the trial court's dismissal" and "remand" for "the district court [to] consider, in the first instance, whether [the banished members] have sufficiently exhausted their tribal remedies." *Dry*

34

*v. CFR Court of Indian Offenses for the Choctaw Nation*, 168 F.3d 1207, 1209 (10th Cir. 1999) (capitalization altered and emphasis omitted).  In doing so, we should permit "the district court . . . to pass judgment on the matter first because we are a court of review, not first view."  *CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1216 (10th Cir. 2020).  Moreover, we are ill-suited to resolve any factual disputes that may arise in applying tribal exhaustion and its exceptions.  *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 803 (10th Cir. 2002).  For now, it is enough to note that because this ICRA case presents difficult and important questions about the scope of the right to habeas corpus, the crucial comity concerns that motivate tribal exhaustion doctrine are at their peak.  That summit must be reached before the district court may properly turn to the substance of the claims—including the determination whether temporary banishment constitutes detention.

### III.

Finally, we address the banished members' appeal of the denial of their motion for the costs and fees of service.  The motion contended that the Business Committee members failed to waive personal service without good cause.  When the parties are in the United States and a defendant "fails, without good cause, to sign and return a waiver" of service, a district court "must" require the defendant to pay the costs of service and related legal fees. Fed. R. Civ. P. 4(d)(2).  Here, the district court referred this matter to a magistrate judge.  Shortly after the district court dismissed the banished members' claims, the magistrate denied the costs motion because the banished members failed to demonstrate that the Tribe lacked good cause in refusing to waive service and because the

35

district court had dismissed the case with prejudice.  We generally review decisions awarding or denying fees for abuse of discretion.  *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1233 (10th Cir. 2018); *see also Estate of Darulis v. Garate*, 401 F.3d 1060, 1063 (9th Cir. 2005) (reviewing a decision under Rule 4(d)(2) for abuse of discretion).  We conclude that adopting the magistrate judge's findings was an abuse of discretion, so we reverse.

There is no dispute that the Tribe failed to sign and return a waiver of service as requested, so the issue is whether the Tribe had good cause for refusing to do so.  The Tribe argues that it had good cause—indeed, "the best imaginable" cause—because service had already been effected when the Business Committee members were asked to waive service.  Aple. Br. at 42.  But the record suggests otherwise.

On June 10, 2019, counsel for the banished members asked counsel for the Tribe if he would waive service for the Business Committee members.  That same day, counsel for the Tribe replied that he was "not authorized to accept or waive service on behalf of any of the defendants."  App'x Vol. I at 173.  A month later, on July 12, 2019, the Tribe filed a motion to dismiss in which it sought dismissal on the ground that the Business Committee members were never served.  The record thus suggests not only that the Business Committee members were not served and refused to waive service, but that they argued the case should be dismissed on that basis.  As a result, the Tribe's good-cause argument is plainly meritless.

The magistrate judge's second reason for denying the motion is also flawed.  The magistrate judge observed, without explanation, that the district court dismissed the

36

action with prejudice for want of jurisdiction.  But a dismissal with prejudice has no direct bearing on whether the Tribe had cause to refuse to waive service.  It also does not preclude the district court from deciding the costs motion.  *See Willy v. Coastal Corp.*, 503 U.S. 131, 137 (1992) (upholding Rule 11 sanctions imposed where the district court lacked jurisdiction); *D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1236 (10th Cir. 2013) ("[A] district court may still award attorney's fees after dismissing the underlying action for lack of subject-matter jurisdiction . . . because a claim for attorney's fees gives rise to issues separate and distinct from the merits of the original cause of action.").  The dismissal with prejudice in this case also rested upon an error. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006) ("[D]ismissals for lack of jurisdiction should be without prejudice because the court, having determined that it lacks jurisdiction over the action, is *incapable* of reaching a disposition on the merits of the underlying claims.").  The district court was wrong to dismiss the action with prejudice, and a decision is necessarily an abuse of discretion when it "depends on a legal error."  *Shook v. Board of Cty. Comm'rs of Cty. of El Paso*, 543 F.3d 597, 611 (10th Cir. 2008).  For these reasons, the district court's decision respecting the costs motion was an abuse of discretion.

## IV.

For the foregoing reasons, we REVERSE the district court's decision that temporary banishment does not qualify as detention under ICRA's habeas provision.  We REMAND with instructions to first decide whether tribal exhaustion precludes the

37

banished members from proceeding in federal court.  We also REVERSE the denial of

the banished members' motion for costs and fees associated with service of process.

**LUCERO**, Senior Circuit Judge, dissenting:

This case is rather straightforward: the district court ruled that it did not have jurisdiction. On that determination, the court was unequivocally correct in dismissing the case. It is the challenged validity of that determination that is brought to us by the petitioners on appeal. Only if we disagree with the district court's dismissal for want of jurisdiction are any further proceedings necessary or warranted. See Dry v. CFR Court of Indian Offenses for the Choctaw Nation, 168 F.3d 1207, 1208-09 (10th Cir. 1999) (concluding the district court erred in determining that it lacked jurisdiction and remanding for consideration of exhaustion of tribal remedies).

My colleagues in the majority do not reverse on jurisdiction. Instead, they seek to finesse the issue, declaring the question "complex and difficult" (Op. at 2), and proceed to engage in an esoteric chicken or egg debate in which they end up pronouncing that even in the face of the trial court's determination that it lacked jurisdiction, it should have considered exhaustion first. Without having reversed the jurisdictional ruling on the merits, and without citing any authority that mandates this conclusion, my colleagues enter into an ordering determination asserting that exhaustion has to be determined before jurisdiction. This will undoubtedly come as some surprise to the trial courts of this circuit.

I simply do not understand what my colleagues have in mind. They are asking the district court to decide an issue that can only be ancillary to the district court's original dispositive resolution of this case. If the district court was correct in its ruling that it lacks jurisdiction, that is the end of the road. By refusing to tell the district court at this

juncture whether it has jurisdiction, the majority renders its requested exhaustion determination on remand effectively useless until we weigh in again. This type of Kabuki theater would be entertaining but for principles of judicial economy.

Moreover, by putting the exhaustion cart before the jurisdictional horse in the context of this case, our panel imposes a layer of undue process which will result in unjustified delay. Exhaustion is far more "complex and difficult" than jurisdiction. Given that one petitioner asserts that a clerk of the tribal court informed her that, "the [banishment] Order was final and nonappealable and that there was nothing that could be done in Tribal Court," the district court could well conclude on remand that the futility exception to the exhaustion doctrine applies. Absent any authority requiring an exhaustion determination before jurisdiction, the complexity of the exhaustion issue in this case is yet another reason to defer to the district court's discretion to first decide the bounds of its jurisdiction.

This appeal was filed in December 2019. The case was at issue on completion of briefing in June 2020. We heard argument five months later in November 2020. Petitioners' banishment and claimed denial of their constitutional liberties extends until November 27, 2023. At that point, this case becomes moot. May I remind my colleagues, justice delayed is truly justice denied.